**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSETTE CARUSO and BRADLEY L. CONWAY, | (Electronically Filed) |
| Plaintiffs, | Civil Case No.: 17-cv-008245(RJS) |
| v. | |
| HAZIM AUDALLA, CHARLES FABRIKANT, FRED FARKOUH, R. CHRIS REGAN, DAVID BONDY, G. TODD CONWAY, DAVID C. ROBERTS, DEANNA L. KOESTEL, and THE AMERICAN ARBITRATION ASSOCIATION, | |
| Defendants, and | |
| AUTOCLEAR, LLC, | |
| Nominal Defendant | |

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS CHARLES FABRIKANT, FRED FARKOUH, CHRIS REGAN, DAVID BONDY, TODD CONWAY, DAVID ROBERTS, DEANNA KOESTEL, AND NOMINAL DEFENDANT AUTOCLEAR, LLC**

---

**NORRIS, McLAUGHLIN & MARCUS, P.A.**

Robert Mahoney, Esq. (*pro hac vice*)
Nicholas A. Duston, Esq.
875 Third Avenue, 8th Floor
New York, New York 10022
Telephone (212) 808-0700
*Attorneys for Defendants Charles Fabrikant, Fred Farkouh, Chris Regan, David Bondy, Todd Conway, David Roberts, Deanna Koestel, and Autoclear, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................**Error! Bookmark not defined.**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................................3

I.    Background of Company management and the present dispute...........................3

II.    The dispute over control of Autoclear dates back to an arbitration compelled by the New Jersey Superior Court in 2011.................................................................4

III.    The Autoclear Defendants prevailed in Phase I of the arbitration, gaining control of the Company from Brad Conway, despite Brad's best (and illegal) efforts to loot the company to avoid the arbitration altogether. .............................................5

IV.    Even after confirmation of Phase One, Brad Conway did everything he could think of to thwart new management's control of the Company, leading the New Jersey Superior Court to enter a sweeping injunction. .....................................8

    A.    Brad Conway and Joan Caruso committed unconscionable acts between February 8, 2016 and June 7, 2016 to thwart transition of control.........................8

    B.    Judge Moore issued a TRO which he later converted to a permanent injunction because of what he deemed to be "outrageous" and "shocking" conduct.................................................................................................10

    C.    Brad Conway repeatedly tried to remove the Arbitrator or water down his authority by forcing a three-member panel in Phase Two...................................11

V.    This lawsuit is another attempt by Brad to regain control of the Company, but he has been sanctioned $503,571.88—which he has already paid—for filing this action and then severely abusing judicial process to delay the issuance of those sanctions. .............................................................................................12

    A.    Brad tried to avoid a decision on the motion to enforce the Permanent Injunction....................................................................................13

    B.    Brad Conway continued to claim that the February 8 meeting was valid and showed the true purpose of this SDNY action through his own arguments—to invalidate the New Jersey Action and the Arbitration. .................14

    C.    Judge Moore's order and sanctions. ....................................................16

VI.    The SAC relies entirely on arguments that Brad Conway has already raised and lost, or arguments contradictory to those that Brad Conway has already raised and won. ........................................................................................17

    A.    Plaintiffs' jurisdictional arguments relating to the New York Convention. ..........17

      B.      Plaintiffs' arguments of wrongdoing by the Autoclear Defendants and the Lawyer Defendants. ...................................................................................21

ARGUMENT ...........................................................................................................24

I.      This Court should abstain from litigating this matter under the Rooker-Feldman and Colorado River abstention doctrines, given Brad Conway's explicit intent—admitted by Brad himself and already determined by Judge Moore—to use this action to overturn the New Jersey Action and the Arbitration. ...........................24

      A.      The Rooker-Feldman doctrine precludes this Court from hearing any of Plaintiffs' claims which would involve review of prior determinations made in Phase One of the Arbitration, as confirmed by the New Jersey Superior Court. ...................................................................................24

      B.      The Colorado River doctrine precludes this Court from hearing any of Plaintiffs' claims which would involve the same or similar issues as those before the parallel, ongoing proceedings in Phase Two of the Arbitration, as compelled by the New Jersey Superior Court. ...................................27

II.     Standards applicable to the remainder of this motion. ......................................31

III.    This Court lacks subject matter jurisdiction over the entirety of the pending dispute. ...............................................................................................................32

      A.      There is no Federal Question jurisdiction under the New York Convention. ....................................................................................33

      B.      Plaintiffs have not adequately pleaded a Federal RICO claim and, therefore, there is no Federal question subject matter jurisdiction under that statute. ...................................................................................36

IV.    Every alleged action taken by the Lawyer Defendants is subject to the litigation privilege. ...........................................................................................................44

V.     Any remaining allegations are simple fiduciary breach claims, which (a) are improperly pled, and (b) subject to a valid and binding arbitration clause. .....................47

      A.      Plaintiffs fail to properly plead derivative fiduciary breach claims. .....................47

      B.      Plaintiffs' fiduciary breach claims are subject to compulsory arbitration. ............48

CONCLUSION........................................................................................................50

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

Aequitron Med., Inc. v. Dyro,
    999 F.Supp. 294 (E.D.N.Y.1998) ................................................................................46

APWU v. Potter,
    343 F.3d 619 (2d Cir.2003) ......................................................................................32

AroChem Int'l, Inc. v. Buirkle,
    968 F.2d 266 (2d Cir. 1992) .....................................................................................45

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)..................................................................................................31

Austin v. Downs, Rachlin & Martin,
    114 F. App'x 21 (2d Cir. 2004) ...............................................................................35

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007)..................................................................................................31

Bletas v. Deluca,
    No. 11 CIV. 1777 (NRB), 2011 WL 13130879 (S.D.N.Y. Nov. 15, 2011) .....................45, 46

Blue Tree Hotels, Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide,
    Inc.,
    369 F .3d 212 (2d Cir.2004) ................................................................................3, 32

Burnett v. Physician's Online, Inc.,
    99 F.3d 72 (2d Cir.1996) ....................................................................................27, 28

Cedar Swamp Holdings, Inc. v. Zaman,
    487 F.Supp.2d 444 (S.D.N.Y.2007) .........................................................................37

Cherry v. Hall,
    No. 02-cv-7895, 2003 WL 29931 (N.D. Ill., Jan. 3, 2003) ......................................43

Colorado River Water Conservation Dist. v. United States,
    424 U.S. 800 (1976)..........................................................................................passim

D.C. Court of Appeals v. Feldman,
    460 U.S. 462 (1983)..................................................................................................24

Department of Econ. Dev. v. Arthur Andersen & Co.,
    924 F. Supp. 449 (S.D.N.Y. 1996) ..........................................................................41

Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,
   544 U.S. 280 (2005)............................................................................................25

Ferrer v. Chevron Corp.,
   484 F.3d 776 (5th Cir. 2007) ..........................................................................38

Figueroa Ruiz v. Alegria,
   896 F.2d 645 (1st Cir.1990)............................................................................37

First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,
   385 F.3d 159 (2d Cir. 2004) ......................................................................31, 32

Green v. Hamilton Intern. Corp.,
   437 F. Supp. 723 (S.D.N.Y.1977) ..................................................................38

Health-Chem Corp. v. Baker,
   915 F.2d 805, 810 (2d Cir. 1990) ..................................................................44

Hecht v. Commerce Clearing House, Inc.,
   897 F.2d 21 (2d Cir. 1990) ........................................................................41, 43

Hoblock v. Albany County Bd. of Elections,
   422 F.3d 77 (2d Cir.2005) ....................................................................25, 26, 35

Holmes v. Securities Investor Prot. Corp.,
   503 U.S. 258 (1992)........................................................................................44

Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments, Ltd.,
   154 F.Supp.2d 682 (S.D.N.Y. 2001) ..............................................................43

Kalin v. Xanboo, Inc.,
   526 F. Supp. 2d 392 (S.D.N.Y. 2007) ......................................................47, 48

Karamoko v. New York City Hous. Auth.,
   170 F. Supp. 2d 372 (S.D.N.Y. 2001) ............................................................32

Lerner v. Fleet Bank, N.A.,
   318 F.3d 113 (2d Cir.), cert. denied, 540 U.S. 1012 (2003)............................37

Makarova v. United States,
   201 F.3d 110 (2d Cir.2000) ............................................................................32

Matter of Lake States Commodities, Inc.,
   936 F. Supp. 1461 (N.D. Ill. 1996)................................................................41

McKithen v. Brown,
   481 F.3d 89 (2d Cir.2007) ..............................................................................26

Moll v. U.S.Life Title Ins.Co.,
  654 F. Supp. 1012 (SDNY 1987) ............................................................................... 40

Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,
  460 U.S. 1 (1983) ............................................................................................... 28, 29

Moss v. Morgan Stanley, Inc.,
  719 F.2d 5 (2d Cir. 1983) ........................................................................................ 39

Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,
  85 F.Supp.2d 282 (S.D.N.Y. 2000) .......................................................................... 42

Officemax Inc. v. Cinotti,
  966 F. Supp. 2d 74 (E.D.N.Y. 2013) ....................................................................... 46

Pagel v. Washington Mut. Bank, Inc.,
  153 Fed. App'x 498 (10th Cir., 2005) ...................................................................... 43

Pan Atlantic Group, Inc. v. Republic Insurance Company,
  878 F.Supp. 630 (S.D.N.Y. 1995) ........................................................................... 33

Pavlov v. Bank of New York,
  135 F.Supp.2d 426 (SDNY 2001) ........................................................................... 40

Revak v. SEC Realty Corp.,
  18 F.3d 81 (2d Cir. 1994) ........................................................................................ 42

Reves v. Ernst & Young,
  507 U.S. 170 (1993) ................................................................................................ 41

Richenbach v. Wells Fargo Bank, N.A.,
  635 F.Supp.2d 389 (D.N.J. 2009) ........................................................................... 45

Roggio v. McElroy, Deutch, Mulvaney, & Carpenter,
  415 F.App'x. 432 (3d Cir. 2011) .............................................................................. 45

Rooker v. Fidelity Trust Co.,
  263 U.S. 413 (1923) ................................................................................................ 24

Roth v. Jennings,
  489 F.3d 499 (2d Cir.2007) ..................................................................................... 32

Samuels Grp., Inc. v. Hatch Grading & Contracting, Inc.,
  697 F. Supp. 2d 1042 (N.D. Iowa 2010) .................................................................. 30

Schmidt v. Fleet Bank,
  16 F. Supp. 2d 340 (S.D.N.Y. 1998) .................................................................. 37, 40

Schuh v. Druckman & Sinel. L.L.P.,
    No. 07-cv-366 (LAK)(GWG), 2008 WL 542504 (S.D.N.Y. Feb. 29, 2008) .........................37

Singh v. HSBC Bank USA,
    200 F. Supp. 2d 338 (S.D.N.Y. 2002) ...........................................................................45

Speed Auto Sales, Inc. v. Am. Motors Corp.,
    477 F. Supp. 1193 (E.D.N.Y. 1979) ...........................................................................38

Tandon v. Captain's Cove Marina of Bridgeport, Inc.,
    752 F.3d 239 (2d Cir. 2014) .......................................................................................32

Terminate Control Corp. v. Horowitz,
    28 F.3d 1335 (2d Cir. 1994) .......................................................................................42

Tessera, Inc. v. Amkor Tech., Inc.,
    No. CV 12-852-SLR, 2014 WL 6997442 (D. Del. Dec. 10, 2014) .............................30

Thomas v. Ford Motor Co.,
    137 F. Supp. 2d 575 (D.N.J. 2001) .............................................................................46

United States v. Porcelli,
    865 F.2d 1352 (2d Cir.), cert. denied, 493 U.S. 810 (1989) .......................................37

United States v. Turkette,
    452 U.S. 576 (1981).....................................................................................................40

Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,
    396 F.3d 96 (2d Cir. 2005) .........................................................................................34

Winters v. Jones,
    No. CV 16-9020, 2018 WL 326518 (D.N.J. Jan. 8, 2018) .........................................45

**STATE CASES**

Baglini v. Lauletta,
    338 N.J. Super. 282, 297, 768 A.2d 825 (App. Div. 2001) .......................................45

DeVivo v. Ascher,
    228 N.J. Super. 453, 550 A.2d 163 (App. Div. 1988), certif. denied, 114 N.J.
    482, 555 A.2d 607 (1989)...........................................................................................46

Gavrilov v. Slinim,
    No. 26396/03 2004 WL 2785181  (Sup. Ct., Dec. 1, 2004) .......................................45

In re Estate of Dawson,
    136 N.J. 1, 641 A.2d 1026 (1994) ....................................................................36, 43, 49

Loigman v. Twp. Comm. of Twp. of Middletown,
    185 N.J. 566, 889 A.2d 426 (2006) ........................................................45, 46

Rabinowitz v. Wahrenberger,
    406 N.J. Super. 126, 966 A.2d 1091 (App. Div. 2009) .............................46

Stack v. Midwood Chayim Aruchim Dialysis Assocs., Inc.,
    54 A.D.3d 935 (2d Dept. 2008) ...............................................................47

## FEDERAL STATUTES

9 U.S.C. §§ 201 *et seq.* ...........................................................................passim

18 U.S.C. §§ 1961 *et seq.* ...............................................................................31

18 U.S.C. § 1961(1)...................................................................................42, 43

18 U.S.C. § 1961(4)...........................................................................................40

18 U.S.C. § 1962(c) ..........................................................................................39

28 U.S.C. § 1738................................................................................................35

## RULES

Fed. R. Civ. P. 9(b) ..........................................................................................31

Fed. R. Civ. P. 12(b)(1) ................................................................................1, 32

Fed. R. Civ. P. 12(b)(6) ...............................................................1, 31, 38, 41

Fed. R. Civ. P. 12(d) ..........................................................................................3

Fed. R. Civ. P. 15(a) .........................................................................................44

Fed. R. Civ. P. 23.1(a) ......................................................................................48

Fed. R. Civ. P. 23.1(b)(3) .................................................................................48

Defendants Autoclear, LLC, f/k/a Control Screening, LLC (the "Company"), Charles Fabrikant, Fred Farkouh, Chris Regan, David Bondy, and Todd Conway (with the Company, the "Autoclear Defendants") and David Roberts, Esq. and Deanna Koestel, Esq. (the "Lawyer Defendants")[1] submit this memorandum in support their motion under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss the First Amended Complaint filed April 5, 2018 ("FAC") and/or the Second Amended Complaint filed June 7, 2018 ("SAC") by plaintiffs Joan "Josette" Caruso ("Caruso") and Bradley L. Conway ("Brad Conway," and with Caruso, "Plaintiffs").

## PRELIMINARY STATEMENT

The age-old analogy of "bites at the apple" is too often used, yet there is no other way to describe the case before this Court. Here, though, Plaintiffs are not trying for their second, third, or even fourth bite at the apple (nor to bite a new apple) through this lawsuit. They already tried that. Instead, Plaintiffs want this Court to find that no one has eaten anything, that there never was an apple, that the case was an orange the whole time, and that Plaintiffs should now be allowed to start eating. But even a cursory glance reveals the bushels of rotten apple cores on the table in front of these Plaintiffs. It is now left to this Court to ask Plaintiffs to leave the table.

The Dispute between the Autoclear Defendants and Brad Conway originated in 2010, and has already been before the New Jersey trial, appellate, and Supreme Courts; the AAA for two phases of arbitration, one now confirmed, the other ongoing; the Belize trial and appellate courts; the District of New Jersey; the Third Circuit Court of Appeals; and this Court.

The heart of this dispute is Brad Conway's breaches of fiduciary duties to the Company and its members' eventual removal of Brad Conway from management. Joan Caruso is involved

---

[1] To the extent Plaintiffs claim this firm, Norris McLaughlin & Marcus ("NMM") is a defendant—even though it isn't in the caption and hasn't been served—all the arguments made as to the Lawyer Defendants apply equally to NMM.

solely because she previously acted as Brad Conway's lackey in his battle to avoid losing the dispute, including Brad having convinced her to steal company property the day he was removed from management (for which she was terminated). Brad Conway has also, apparently, convinced her to join his ongoing quest to litigate-to-death the Company he no longer runs. This is merely the latest of many attempts by Brad Conway to avoid the consequences of his removal from Company management. Importantly, he has *already* been sanctioned a whopping $503,571.88 for his prior bad conduct, *including his filing of this very action.*

This action must be dismissed for a variety of reasons. First, the SAC asks this Court to review prior judgments and interfere in ongoing litigation of and in the New Jersey Superior Court, implicating the *Rooker-Feldman* and *Colorado-River* abstention doctrines. This Court also lacks subject matter jurisdiction to hear this matter. There is no jurisdiction under the New York Convention, because Brad Conway is judicially *and* collaterally estopped from claiming federal law applies to the arbitration clause in question. Incredibly, Brad has already argued, and won, an application to compel arbitration under the applicable clause pursuant to the New Jersey Arbitration Act, *and* has already argued and lost arguments that Federal Law applies to the very same clause. There is also no jurisdiction under RICO, a claim which must be dismissed for over a dozen pleading failures. Separately, all the conduct alleged against the Lawyer Defendants is subject to the litigation privilege. What remains of the claims against the Autoclear Defendants must either be dismissed for either failure to properly plead them derivatively or due to compulsory arbitration.

For all of these reasons, the Court should dismiss this action in its entirety, with prejudice.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The dispute between the Autoclear Defendants and Brad Conway has a long and tortured history, and this motion could not possibly tell the entirety of that history. Those of the many prior proceedings that relate to this motion are briefly summarized here. The facts that follow are taken from the pleadings or transcripts of proceedings[2] in the various other courts in which this long-running dispute has played out. This Court need not take the Autoclear and Lawyer Defendants' word for what has occurred; it need only look to the previous decision of the Honorable Judges Klein, Moore, and Wigenton. This Court may properly consider publicly available filings and transcripts of proceedings from prior actions on a motion to dismiss, particularly where there are allegations that claims are barred by prior litigation. See, e.g. Blue Tree Hotels, Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F .3d 212, 217 (2d Cir.2004).

**I. Background of Company management and the present dispute.** [3]

The Company develops, manufactures, and sells security checkpoint equipment. The Company was founded by Granville Conway, father of Brad Conway and defendant Todd Conway, who managed the company with his sons until he died. Over the years, Fabrikant, Regan, Bondy and others became members through investments in the Company.

---

[2] The transcripts are attached to the Declaration of Robert Mahoney, Esq. dated August 6, 2018 ("Mahoney Dec.") at Ex. A-G, and cited as follows. The transcript of the hearing before Judge Klein on July 20, 2011, Ex. A, is the "2011 Tr." The transcript of the hearing before Judge Moore on January 28, 2016, Ex. B, is the "Jan. 28 Tr." The transcript of the hearing before Judge Moore on June 7, 2016, Ex. C, is the "Jun. 7 Tr." The transcript of the hearing before Judge Wigenton on April 3, 2018, Ex. D, is the "Apr. 3 Tr." The two volume transcript of the hearing before Judge Moore on May 23, 2018, Ex. E & F, are the "May 23 vol. 1 Tr." or "May 23 vol. 2 Tr.". The transcript of the opinion read into the record by Judge Moore on July 13, 2018, Ex. G, is the "Jul. 13 Tr."

[3] The limited statements not taken from the FAC, SAC or cited transcripts are for background purposes and not meant to convert the motion pursuant to Fed. R. Civ. P. 12(d).

The first court to hear the dispute between the Autoclear Defendants and Brad Conway was the New Jersey Superior Court of Essex County, Chancery Division, in a matter bearing Docket Number ESX-C-123-11 (the "New Jersey Action"). That Court maintains jurisdiction to this day. See Jun. 7 Tr., Mahoney Dec., Ex. C, p. 101:21-22. As Judge Moore of that Court succinctly stated *this July*, the New Jersey Action "is really a shareholder dispute concerning. . . Autoclear." Jul. 13 Tr., Mahoney Dec., Ex. G, p. 5:6-9; see also May 23 Tr. vol. 2, Mahoney Dec. Ex. F, p. 6:4-7; 2011 Tr., Mahoney Dec., Ex. A, p. 103:2-6 ("the. . . dispute in this case. . . on its face. . . is a dispute as to who is running this company and who should be running it."). The Lawyer Defendants, along with NMM, represented and continue to represent the Autoclear Defendants in the New Jersey Action and all related proceedings. The Autoclear Defendants were eventually successful in removing Brad from management of the Company and have since become the new board of managers for the Company. Arbitration over Brad's fiduciary breaches is currently ongoing.

II. **The dispute over control of Autoclear dates back to an arbitration compelled by the New Jersey Superior Court in 2011.**

In October 2010, the members of the Company voted to remove Brad Conway from the board, and he contested the validity of that election. See Jan. 28 Tr., Mahoney Dec., Ex. B, p. 7:5-10. (For non-relevant reasons, another 2013 vote was the one ultimately enforced by the Arbitrator.) In May 2011, the individual Autoclear Defendants, with other members, filed an action to enforce the election and assert various causes of action against Brad Conway; Brad Conway caused the Company to intervene and demand arbitration. See 2011 Tr., Mahoney Dec., Ex. A, p. 4:17-5:2; Jan. 28 Tr., Mahoney Dec., Ex. B, p. 7:11-16.

Judge Klein construed the arbitration clause in the Company's 1995 operating agreement, which remains in effect today. See Mahoney Dec., Ex. H at ¶ 13 ("Any material dispute hereunder

4

shall be decided in accordance with the rules of the American Arbitration Association which award shall be final."). Brad argued the arbitration clause was broad enough to cover the parties' dispute, including claims for member expulsion and breaches of fiduciary duties. See Mahoney Dec., Ex. I, p. 7.[4] Judge Klein accepted those arguments and compelled arbitration. See 2011 Tr., Mahoney Dec., Ex. A, p. 106:12-17; 112:5-9 ("[w]e've all seen a lot of arbitration clauses," and "[t]his is one of the most general that I have seen."); see also Jan. 28 Tr., Mahoney Dec., Ex. B, p. 7:20-24.

Judge Klein compelled arbitration pursuant to the AAA rules (the "Arbitration") before arbitrator Garofalo (the "Arbitrator"), which remains pending today. The Arbitration was bifurcated into two phases. The first phase addressed the issues of management and control, and the second phase addressed the other issues raised in the complaint against Brad Conway. See Jan. 28 Tr., Mahoney Dec., Ex. B, p. 8:24-9:4; Jul. 13 Tr., Mahoney Dec., Ex. G, p. 5:9-15. "The action included claims for breach of fiduciary duty [as] part of Judge Klein's referral to arbitration." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 71:16-18.

### III. The Autoclear Defendants prevailed in Phase I of the arbitration, gaining control of the Company from Brad Conway, despite Brad's best (and illegal) efforts to loot the company to avoid the arbitration altogether.

Although the bifurcation was intended to save time, Phase I lasted over five years, during which time Brad Conway remained in control of Autoclear. The lengths to which Brad Conway went to retain control were innumerable. The most egregious were (a) issuing himself retroactive

---

[4] Brad's personal attorney, Art Lindeman, joined all the arguments made by the Company in favor of arbitration. See 2011 Tr., Mahoney Dec., Ex. A, pp. 3:9-10; 57:22-58:2 ("I would like to defer to Mr. Frazza. . . that this matter should be sent to arbitration.").

bonuses to increase his ownership in Autoclear by over 8%;[5] (b) "loaning" himself nearly $1M;[6] (c) reregistering Autoclear to Belize without notice to the members;[7] (d) and unilaterally amending the operating agreement to remove the arbitration clause to get out of the Arbitration.[8] Brad also tried to increase his "side" of the vote by unilaterally issuing membership interests to employees (including Caruso) and his children between 2010 and his ouster in 2016.[9]

Phase I ultimately ended on October 6, 2015, when the Arbitrator entered a partial final award on all Phase I issues and awarded control to the Autoclear Defendants, removing Brad Conway from management of the Company. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 6:14-21; Jul. 13 Tr., Mahoney Dec., Ex. G, p. 5:18-24. The Arbitrator reached this determination *without* counting certain disputed membership interests, the decision on validity of which the Arbitrator reserved for Phase Two. See Mahoney Dec., Ex. L, Award p. 3. **This included the validity of the membership interests of Hazim Audalla**, which the Arbitrator reserved for "resolution. . . in this arbitration." Id. at Award p. 3 and Opinion, p. 17.

---

[5] In Phase Two of the arbitration, the Arbitrator just issued an order for partial summary judgment on July 18, 2018 voiding this nearly $1M in interests. See Mahoney Dec., Ex. J.

[6] In Phase Two, the Arbitrator voided this $970,000 loan as a breach of Brad Conway's duty of loyalty to the Company. See Mahoney Dec., Ex. K; see also May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 53:1-3 ("the loan breached Brad Conway's fiduciary duty of loyalty to the company.").

[7] This move was voided during Phase One, and Brad Conway has now been enjoined from claiming the Company is a Belize entity. See § IV(B), *infra*; see also Jan. 28 Tr., Mahoney Dec., Ex. B, p. 9:5-12; 51:5-9; 54:10-14 (describing the domiciliation and labeling it "an attempt to avoid arbitration").

[8] This also has been voided, and Brad has been enjoined from claiming any operating agreement other than the April 1, 1995 operating agreement has any legal validity. See § IV(B), *infra*.

[9] The validity of these interests is one of the remaining issues in Phase Two of the Arbitration. See Mahoney Dec., Ex. L, Order, p. 3.

Brad continued to refuse to relinquish control of the Company until the award was confirmed. The Phase I Partial Final Award was ultimately confirmed by Judge Moore of the New Jersey Superior Court on January 28, 2016. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 6:25-7:2; see also Mahoney Dec, Ex. M. On January 28, 2016 Ms. Koestel presciently voiced concern that "computer files and money, and inventory [might] suddenly [go] to the Philippines. . . " if the Court did not specifically order that not occur. To alleviate his and plaintiffs' concerns, Judge Moore ordered "that counsel. . . meet and discuss and attempt to jointly develop a plan." Jan. 28 Tr., Mahoney Dec., Ex. B, p. 81:18-82:1. Judge Moore "had tremendous concerns[10] about the transition of control. . . and. . . wanted a plan. . . ." Jun. 7 Tr., Mahoney Dec., Ex. C, p. 66:17-24; see also Jan. 28 Tr., Mahoney Dec., Ex. B, p. 78:23-79:4.

The Autoclear Defendants, through the Lawyer Defendants, "actually submitted to the plan, Brad did not." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 7:13-14; Jul. 13 Tr., Mahoney Dec., Ex. G, p. 6:15-16. Because Brad Conway refused to participate in the transition, on February 8, 2016, Judge Moore was forced to simply lift the stay and give full force and effect to the Arbitrator's decision placing the Autoclear Defendants in control of the Company. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 7:15-18; see also Mahoney Dec., Ex. N. Judge Moore "retain[ed] jurisdiction for phase two." Jun. 7 Tr., Mahoney Dec., Ex. C, p. 101:21-22.

---

[10] Judge Moore intended for nothing to be done "outside the ordinary course of business. . . during this stay period" regarding both the U.S. portion of the Company and "the companies that it owns overseas." Jan. 28 Tr., Mahoney Dec., Ex. B, p. 87:4-10 ("I think that's what the Court's intention is."). He also said that "if anything happens that is contrary to what we're discussing on the record, there will be consequences." Jan. 28 Tr., Mahoney Dec., Ex. B, p. 88:1-23.

**IV.** **Even after confirmation of Phase One, Brad Conway did everything he could think of to thwart new management's control of the Company, leading the New Jersey Superior Court to enter a sweeping injunction.**

The events that unfolded on and after February 8th were "unacceptable conduct, shocking conduct." Jul. 13 Tr., Mahoney Dec., Ex. G, p. 33:20-25.   "[T]he company's suspicions about Mr. Conway's motives and plans turn[ed] out to be entirely justified" Id., p. 34:6-9.  Brad "and his agents. . . stole the company's computer servers critical to the functioning and operation of the company, made unauthorized financial transactions, and attempted to maintain and regain control of the company." Id., p. 33:6-12. "Egregious actions have occurred here" which Judge Moore "just f[ou]nd outrageous," and which lead him to be "surprised the company is still operating," because Brad's actions created "a very serious risk of going insolvent." Jun. 7 Tr., Mahoney Dec., Ex. C, pp. 86:13-18; 108:23; 109:8-9. "The company's very survival was at stake, because of Mr. Conway's conduct during and after the transition of control," and "[i]t was remarkable in real time to be hearing what was going on." Jul. 13 Tr., Mahoney Dec., Ex. G, p. 32:22-33:2.

**A.** **Brad Conway and Joan Caruso committed unconscionable acts between February 8, 2016 and June 7, 2016 to thwart transition of control.**

Within hours of Judge Moore placing the Autoclear Defendants in control by lifting the stay on February 8, 2016, Brad Conway "coincidentally. . . held an emergency shareholders meeting. . . where Brad claimed that a majority approved an emergency resolution that transferred authority. . . back to Brad." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, pp. 7:19-8:1; see also Jun. 7 Tr., Mahoney Dec., Ex. C, p. 68:1-9; 68:17-24 (noting the meeting occurred "within hours" and asking "[w]hat's the emergency. . . well, the control. . . had finally been transferred").  The same day:

> Mr. Brad Conway and his associates, including [his co-plaintiff] Josette Caruso took the company's computer. . . servers critical to the operation of the . . .

company, which forced the Court to enter another order on February 8th that required defendant and his associates to return the servers and any other company equipment to the. . . company's premises immediately. That also included a call to the Fairfield Police Department to get their assistance in doing so. It was a very unusual and in the Court's view grave situation that occurred.

Jul. 13 Tr., Mahoney Dec., Ex. G, p. 7:7-18; see also Mahoney Dec., Ex. O. The entire theft was captured on video, and the intent had been to send the servers to the Philippines. Jun. 7 Tr., Mahoney Dec., Ex. C, p. 69:11-17 & 70:7-9 ("Ms. Caruso referred to the company employee taking the video as a traitor."). In sum, "[t]he moment the pen strikes the order the stay is removed," and "[w]e have an emergency meeting and we have the life's blood of the company being transferred to Philippines." Jun. 7 Tr., Mahoney Dec., Ex. C, p. 71:4-7.

In the ensuing days, Brad Conway took other actions to frustrate the Autoclear Defendants' ability to take control of the Company. Jul. 13 Tr., Mahoney Dec., Ex. G, p. 7:2-4. He was clearly "attempting to undermin[e] the effectiveness of the arbitration award to retain substantial control over the Company's operations abroad." Jun. 7 Tr., Mahoney Dec., Ex. C, p. 71:8-13. Brad Conway's actions around and after the January 28 and February 8, 2016 orders included:

- Giving out "sham membership interests in the company in summer of 2015 and at times" he asked the employees with those membership interests "to endorse blank signature pages which they believe were [then] used as part of the February 8th election. . . ." Jun. 7 Tr., Mahoney Dec., Ex. C, p. 73:11-16.
- "[R]emoving papers, documents, computer files, [and] computers from the office and relocating them to Brad's house." Id., p. 73:5-10. Brad "intended to set up a company out of his house in order to leave the Fairfield [New Jersey] facility without the capacity to make payroll," which deficiency he would then use "to take control of ACA," i.e. Autoclear's largest overseas operation, Autoclear Asia. Id., p. 74:3-9 & 80:13-17 (Brad stated "any number of people can be in control" because "anyone who pays their salaries over there will have their allegiance.").
- "[E]ncrypting their e-mails as well as other files." Id., p. 73:5-10
- Holding "meetings and conversations. . . wherein it was made clear. . . that Brad intended to ignore the arbitration award and this Court's order for the purpose of returning control over the company's operations." Id., p. 18-24. He talked about "fighting the duress of this [New Jersey] judge, particularly from places like Jordan and Belize." Id., p. 80:5-11

- "[F]ully maintain[ing] the viability and validity and authority of the Belize company." Id., p. 79:1-10
- Making "a number of. . . untypical transfers. . . in the waning days of his control when the Court had already ordered that nothing out of the ordinary course of business be undertaken." Id., p. 71:22-72:3. These included:
    - A "$150,000 transfer, directed by Brad into an [Autoclear Asia] account where the typical monthly transfer of payroll funds is $40,000. . ." Id., p. 72:3-10.
    - "[A] December 2015 transfer of $95,000 to Brad himself for the so-called medical reimbursement." Id.
    - "[A] transfer of $75,000 to Tom Curran, a Canadian attorney" whom Brad presumably planned to help him gain control of Autoclear's Canadian operations. Id.
    - When the $75,000 transfer "did not go through," instead, "a later transfer, February 23rd, long after the stay had been lifted. . . of $125,000 to Mr. Curran" Id., p. 72:11-24.
- Being caught in recorded "voicemail messages and lengthy phone conversations" about opening a Jordanian bank account in the name of the Company after control had been transferred. Id., p. 75:14-76:25; see also Jun. 7 Tr., Mahoney Dec., Ex. C, p. 80:18-21 (quoting Brad as saying, on March 4, 2016 "we could put in wire instructions to send money from the [Autoclear Asia] bank to the Jordanian bank."). Brad happened to have sent "a $59,500 check from the company" dated February 6, 2016—after the award had been confirmed and two days before the stay was lifted—as "an advance in salary." Id., p. 75:17-76:3; see also Jun. 7 Tr., Mahoney Dec., Ex. C, p. 78:23-81:23 (Reading extensive portions of the transcript of that call into the record).
- Assigning a patent to an Irish corporation and/or himself. Id., p. 71:13-21.

**B.**     **Judge Moore issued a TRO which he later converted to a permanent injunction because of what he deemed to be "outrageous" and "shocking" conduct.**

Judge Moore entered a temporary restraining order on February 23, 2016 based on these and other acts. See Jun. 7 Tr., Mahoney Dec., Ex. C, p. 67:7-19. Brad and others, including co-plaintiff Joan Caruso, were thereby restrained from, *inter alia*:

- interfering with control of the Company;
- transferring selling, loaning, mortgaging or otherwise encumbering any assets of or property of the company;
- representing to anyone that any operating agreement had any effect whatsoever other than the April 1, 1995 operating agreement;

- representing to anyone that the February 8th meeting had any legal effect whatsoever; or
- taking any further steps toward maintaining the company's registration in Belize.

See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 8:5-9:6; Jul. 13 Tr., Mahoney Dec., Ex. G, p. 8:3-20; see also Mahoney Dec., Ex. P.

After extensive briefing and argument, the Court converted the TRO into a permanent injunction on June 7, 2016. May 23 Tr. vol. 2, Mahoney Dec., Ex. F p. 10:24-11:1; Jul. 13 Tr., Mahoney Dec., Ex. G, p. 8: 21-24; see also Mahoney Dec., Ex. Q (the "Permanent Injunction"). The June 7, 2016 Order also "held that the February 8th meeting and resolution w[ere] null, void ab initio, defective, and w[ere] to be given no force and effect." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 10:24-11:1; Permanent Injunction, Mahoney Dec., Ex. Q, ¶ 4. Specifically, Judge Moore found that the February 8th meeting both violated court orders and were, in any case, "a sham." Jun. 7 Tr., Mahoney Dec., Ex. C, p. 77:16-24.

Judge Moore said "what's at issue. . . is really the fundamental rule of law. Are individuals permitted to ignore a clear court order or not?" Jun. 7 Tr., Mahoney Dec., Ex. C, p. 62:23-25.

**C.  Brad Conway repeatedly tried to remove the Arbitrator or water down his authority by forcing a three-member panel in Phase Two.**

Some of Plaintiffs' allegations in this case are directed to the AAA and relate to their request to disqualify the Arbitrator for Phase Two and/or force the AAA to administer Phase Two with a three-arbitrator panel. As outlined in the motion filed by the AAA on July 19, 2018, none of these requests are proper. See Dkt. No. 44-46. The Autoclear and Lawyer Defendants join those arguments in their entirety, and do not address them further here so as not to belabor the point. However, the Court should be aware that in addition to the above-referenced conduct, Brad Conway has embarked on a furious campaign to rid himself of Arbitrator Garofalo after the New Jersey Action confirmed the Phase One award. Each of his attempts have been (a) transparent

shots taken by a sore loser, and (b) rejected. This latest version of "arbitrator shopping" should also be rejected.

**V.    This lawsuit is another attempt by Brad to regain control of the Company, but he has been sanctioned $503,571.88—which he has already paid—for filing this action and then severely abusing judicial process to delay the issuance of those sanctions.**

As proceedings relating to the injunction were ongoing, Brad had also filed an appeal, but the Appellate Division dismissed that appeal on July 28, 2017 because Brad Conway failed to file a conforming brief. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 40:12-22. The New Jersey Appellate Division denied Brad's motion to vacate the dismissal on September 29, 2017. Id. In Judge Moore's "view it is not coincidental that Brad Conway filed the first [Southern District of] New York action less. . . than a month later on October 25, 2017." Id., p. 40:12-22 (referring to the initial complaint filed in this action); see also Dkt. No. 2. This Court ordered Brad to amend his original complaint, see Dkt. No. 5, resulting in his filing of the FAC on April 5, 2018.

Upon learning that Brad Conway had filed this action, the Autoclear Defendants, through the Lawyer Defendants, filed a motion to enforce the Permanent Injunction on November 15, 2017. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 13:12-14. The FAC violated that injunction by repeatedly asserting that the Company was and is a Belize entity, that the February 8th, 2016 meeting was valid, that agreements other than the April 1995 operating agreement governed, and that Judge Moore's and/or the Arbitrators orders were invalid.

The motion to enforce the Permanent Injunction has its own tortured procedural history. The punchline is that once Judge Moore was finally able to hear the motion, he found that the FAC was Plaintiffs' "attempt[] to re-litigate the [New Jersey] Court's order in other forums," which "effectively undermin[ed] the whole process of this [New Jersey Action] lawsuit." Jul. 13 Tr., Mahoney Dec., Ex. G, p. 25:8-26:8. Accordingly, Judge Moore ordered Brad Conway to withdraw

the FAC or replead it by June 5, 2018. May 23 Tr. vol. 2, Mahoney Dec., Ex. F, pp. 43:21-44:3; see also Mahoney Dec., Ex. R. Judge Moore also sanctioned Brad Conway $503,571.88. Jul. 13 Tr., Mahoney Dec., Ex. G, p. 35:7-8; see also Mahoney Dec., Ex S.

**A.    Brad tried to avoid a decision on the motion to enforce the Permanent Injunction.**

The motion to enforce the Permanent Injunction was adjourned several times after its November, 2017 filing. In January, the Arbitrator issued a partial final award in Phase Two of the Arbitration voiding Brad's self-dealing $970,000 loan. May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 14:4-7. Judge Moore adjourned the motion to enforce the Permanent Injunction to February 16, 2018 so that the motion to confirm the latest award could be heard on the same day. Id., p. 14:18-15:10. On February 13, Brad Conway filed a notice of removal with the United States District Court for the District of New Jersey (the "First Removal") but did not notify the New Jersey Chancery Court of the removal until February 15th, i.e. the day before the then-scheduled return date. Id., p. 14:18-15:10; see also Jul. 13 Tr., Mahoney Dec., Ex. G, p. 10:25-11:5.

On April 3, District Court Judge Susan Wigenton denied Brad Conway's motion to transfer the New Jersey Action to the Southern District of New York (to be consolidated with this action), instead finding that the District Court lacked subject matter jurisdiction and remanding the matter to the New Jersey Chancery Court. May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 15:20-16:2 (quoting Wigenton Decision); see also Mahoney Dec., Ex. T.

Judge Moore again adjourned the motion to enforce the Permanent Injunction so the parties could brief issues relating to the First Removal—which again violated the injunction by, *inter alia*, suggesting the Company was a Belize entity—and a new return date was ultimately scheduled for May 23, 2018. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 18:11-23; Jul. 13 Tr., Mahoney Dec., Ex. G, p. 11:24-12:4. Late in the afternoon of May 22, "Brad Conway called the [New Jersey] Court. . . to inform the Court that he removed this action again to the District. . . of New

Jersey... [and] emailed the petition for removal to the Court and Mr. Roberts at 2:41 p.m." May 23 Tr. vol. 2, Mahoney Cert., Ex. F, p. 18:11-2. For a second time, Brad had removed the New Jersey Action the day before the return date of a motion seeking to sanction him for violating an injunction, and for a second time that removal violated the injunction in question (the "Second Removal"). Id.

Fortunately, "Judge Wigenton dismissed the action again for lack of subject matter jurisdiction and noted that further filings by Brad Conway in the matter would be subjecting him to sanctions," which order was emailed to Brad Conway and the New Jersey Court. May 23 Tr. vol. 2, Mahoney Cert., Ex. F, p. 19:3-20:7; see also Mahoney Dec., Ex. U. On May 23, the New Jersey court decided to hear the oral argument as scheduled. Jul. 13 Tr., Mahoney Cert., Ex. G, p. 12:24-13:1.

**B.    Brad Conway *continued* to claim that the February 8 meeting was valid and showed the true purpose of this SDNY action through his own arguments—to invalidate the New Jersey Action and the Arbitration.**

At the May 23 argument, Brad Conway was defiant as ever, and his arguments *that day* continued to violate Judge Moore's injunction. For example, Brad continued to try to justify behavior that Judge Moore had already called "outrageous," saying that on February 8, 2016 "I [Brad Conway] considered that I was still in control at that point. . . . and there was a possibility that **some other court** would say that the new election would supersede. **That still remains to be seen.**" May 23 Tr. vol. 1, Mahoney Cert., Ex. E, p. 37:9-13 (emphasis added). Brad continued to suggest that he was the proper management of the Company, and that this Southern District Court would eventually overturn the decisions rendered in the Arbitration and New Jersey action. Specifically, Brad argued (falsely) that:

> between the 8th and the 23rd, **we had a reasonable basis.  It could have b[een] wrong as a matter of law.  Southern District of New York will actually determine that someday**.  That's how **we** were—in control and, yet, we still didn't

go around and—and after the injunction say, well, we don't respect what Judge [Moore said].

Id., p. 33:11-21 (emphasis added). Brad Conway finally admitted to Judge Moore the real reason he filed the complaint in this action, saying that in "the New York action. . . that the Federal Court may rule that the elections at the February 8th meeting in fact superseded the 2013 meeting[11] under the [FAA] or the arbitra[l] convention." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 26:7-16. "**This is about getting into the right court.**" May 23 Tr. vol. 1, Mahoney Cert., Ex. E, p. 34:8-15 (emphasis added).

Brad's reasoning appears to be that this Court needs to make "an arbitrability determination. . . over the operating agreement" under which he purported to hold the February 8th vote putting him back in control. Id., p. 31:23-32:1. Brad also argued that "five [other] amendments to the operating agreement that he drafted after the October 2015 award were valid, because the arbitrator did not rule on them." May 23 Tr. vol. 2, Mahoney Cert., Ex. F, p. 30:19-31:5 (referring to the Oct. 30, Nov., Dec. 13, Jan. 6, and Jan. 27 amendments all of which "not surprisingly" contain a Belize choice of law clause). Brad argued that "it will be **up to the Southern District of New York Judge** whether. . . that election. . . is invalid or that that operating agreement is invalid. . . . So they're not null and void. . . but they will be before Judge McMann [of the SDNY]." May 23 Tr. vol. 1, Mahoney Cert., Ex. E, p. 40:25-41:9 (emphasis added).

In other words, Brad argued, and is arguing here, that operating agreements and votes that he held *during* Phase One of the arbitration—placing him in control through the votes of persons to whom he had granted sham membership interests—will somehow supersede the votes that

---

[11] The 2013 Meeting is what was ultimately found to have removed Brad from his position at the Company, per the Arbitrator's October, 2015 partial final award; a new meeting had been held after the original 2010 meeting that originated this dispute.

removed him from control, and that this Court is the one that will make that determination. May
23 Tr. vol. 1, Mahoney Dec., Ex. E, p. 23:7-21. Brad falsely represented to Judge Moore that those
votes were held by legitimate members of the Company, id., p.23:7-21, and he has repeated the
same falsehood in the SAC, referring to these same sham amendments as those having been voted
on by the "John and Jane Roes" referred to in Plaintiffs' complaint. See SAC, pp. 34-35.

But the validity of these "votes" and those "elections" *are* before the Arbitrator in Phase
Two of the Arbitration, which is ongoing, because the validity of the membership interests that
were allegedly *cast* in those votes and elections is a question in Arbitration Phase Two. See Jun.
7 Tr., Mahoney Dec., Ex. C, p. 73:11-16 (noting Brad's issuance of "sham membership interests")
and p. 76:3-7 (referring to the Feb. 8th election as a "sham") and p. 90:16-19 (noting the dispute of
the validity of certain persons' membership interests in the company who purportedly signed on
to litigation against the Company in Belize); see also Mahoney Dec., Ex. L, Award, p. 3 (reserving
for Phase Two the decision on the validity of interests issued by Brad Conway during Phase One).

In short, there is no doubt what Brad Conway is and was trying to accomplish: regain
control of the Company by challenging prior and ongoing arbitral proceedings.

## C.  Judge Moore's order and sanctions.

Judge Moore was not buying what Brad was selling. He found that:

> Through the New York action Brad Conway is trying desperately to change the
> results of the Court's June 7th order, so that he can regain control of the company.
> That is patently clear, and patently violative of the court's order. I wanted to clear
> that up... What can be more violative of this court's order, than that [SDNY] filing.

May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 41:7-25; 42:19-20. Judge Moore reiterated:

> Mr. Conway directed the theft of the company's computer serv[ers], and interfered
> with the new managements control of the company. . . . [T]hen we get the
> submissions in the New York action, the first removal, [and] the second removal
> which sought to reverse the October, 2015 award and the court's January 28th,
> February 8th. . . February 23rd, and June 7th orders by asking Federal Courts to rule

that the February 8th meeting was a valid election which put defendants back in control of the company effectively undermining the whole process of this lawsuit.

Jul. 13 Tr., Mahoney Dec., Ex. G, p. 25:8-26:2. "Mr. Conway attempted to re-litigate the Court's order in other forums which, again, in the Court's view threatens the company's ability to function, because of these enormous attorneys' fees and other costs." Id., p. 26:4-8. Thus, Judge Moore ordered Brad Conway to withdraw or replead this New York action, "by June 5th or the Court will make him responsible for any attorneys' fees and costs the company and these plaintiffs incur in the New York action." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, pp. 43:21-44:3. Judge Moore also found that "financial sanctions are warranted to compel Brad Conway to comply with the Court's January 28th, June 7th orders," which "[h]e has continually violated." Id., pp. 43:21-44:3; 45:25-5; 46:24-47:6. The sanction was an astounding $503,571.88. Mahoney Dec., Ex. S.

**VI.** **The SAC relies entirely on arguments that Brad Conway has already raised and lost, or arguments contradictory to those that Brad Conway has already raised and won.**

It is against this backdrop that this Court must assess the SAC, which relies *entirely* on arguments either (a) that Brad Conway has already presented to other courts and lost, or (b) that contradict other positions Brad Conway has taken before other courts and won. Brad Conway has already argued extensively in this dispute whether the New Jersey Arbitration Act or the Federal Law applies to the arbitration clause in the relevant operating agreement. He has also already extensively litigated his claims of alleged wrongdoing by both the Lawyer Defendants and the Autoclear Defendants. Two other Courts have already weighed in on those arguments.

**A.** **Plaintiffs' jurisdictional arguments relating to the New York Convention.**

Plaintiffs argue that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, implemented by 9 U.S.C. §§201 *et seq.* (the "New York Convention") applies to the arbitration agreement relevant to this dispute. See SAC, pp. 1-19. But, Brad Conway has *both*

advocated that the New Jersey Arbitration Act applies to the relevant arbitration agreement (and won that argument) and argued that the New York Convention applies to the relevant arbitration agreement (and lost that argument *twice*).

        ***i.***     ***Brad, via the Company he still controlled and his own personal attorney, advocated for applying New Jersey law to the operating agreement's arbitration clause.***

In 2011, when seeking to compel the Arbitration in the first place, Brad Conway—via the Company he still controlled, and which arguments his personal attorney joined—argued that the New Jersey Arbitration Act, and *not* the New York Convention, applied to the still-effective 1995 operating agreement. <u>See</u> Mahoney Dec., Ex. I, p. 13 (citing the New Jersey Arbitration Act); <u>see also</u> 2011 Tr., Mahoney Dec., Ex. A, p. 72:1 ("New Jersey. . . is where this should be."). Judge Klein accepted Brad's argument that arbitration should be compelled under New Jersey law, not Federal or international law. <u>See</u> 2011 Tr., Mahoney Dec., Ex. A, pp. 104-112.

In 2015, in the last set of briefs filed by the Company while it was under Brad's control, the then-Company lawyers *again* argued that "the [New Jersey] Revised Arbitration Act applies to the Company's cross-motion to vacate the Award." <u>See</u> Mahoney Dec., Ex. V, p. 54; <u>see also</u> Jan. 28 Tr., Mahoney Dec., Ex. B, p. 14:22-24 & p. 32:17-19 ("Brad Conway also. . . joins in the opposition **in total** and cross moves consistent with the position filed by the company.") (emphasis added). Again, Judge Moore found that New Jersey law applied, expressly rejecting a federal ground for vacating the award because "[t]he law of the State regarding vacating of arbitration awards is to me exceptionally clear, and doesn't allow for vacating awards based on manifest disregard for the law. . . under New Jersey law." Jan. 28 Tr., Mahoney Dec., Ex. B, p. 67:5-12; & p. 66:23-67-1 (noting manifest disregard is a concept under the FAA that "New Jersey courts have explicitly rejected.").

*ii.* ***Brad's mission to forum-shop his way out of losing control of the Company has already included an argument that the New York Convention applies, which he already lost—twice.***

The Appellate Division dismissed Brad Conway's appeal of the orders confirming Phase One's award removing him from control on July 28, 2017 and denied a motion to vacate the dismissal on September 29, 2017. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 40:12-22. Brad filed this action less than a month later on October 25, 2017. See Dkt. No. 2. Apparently, around the time his loss of control of the Company became final in New Jersey State Courts in late 2017 is when Brad also "realized that this was a Convention Act case," meaning "9 U.S.C. [§§] 201 to 208," as he later described to Judge Wigenton of the District of New Jersey. See Apr. 3 Tr., Mahoney Dec., Ex. D, p. 8:11-14.

*a.*   *Brad Conway's New York Convention Arguments to the District of New Jersey.*

During argument on Brad's motion to transfer the New Jersey Action, after the First Removal, to the SDNY to be consolidated with this case, Brad argued to Judge Wigenton that "[t]he question before the Court is, is there. . . Subject matter jurisdiction under Chapter 2, and has it been correctly removed per the Chapter 2 of the. . . Convention Act." Apr. 3 Tr., Mahoney Dec., Ex. D, p. 11:15-18 (referring to the FAA). In violation of Judge Moore's June 7, 2016 injunction, Brad impermissibly argued to the New Jersey District Court that the Company was a Belize entity. See Mahoney Dec., Ex. W, pp. 7, 10 (stating, *inter alia*, that "[t]he arbitrator never had the power to change Belize registration. . . ."), p. 11 ("The LLC at all relevant times, has been a ***domiciliary*** or citizen of Belize")(emphasis in original). He also argued that, whether or not it was a Belize entity, if the operating agreement had just one contracting party that is a foreign citizen, then it is deemed to be nondomestic and subject to the New York Convention. Id., pp. 10-11; see also Apr. 3 Tr., Mahoney Dec., Ex. D, p. 9:11-20. And Brad also argued that the Company held "two large

facilities overseas," meaning any disputes over it fell within the New York Convention. <u>See</u> Mahoney Dec., Ex. W, p. 11.

Judge Wigenton did not accept **any** of Brad's arguments, finding that "[t]here is no other basis upon which this Court should assume jurisdiction whatsoever. . . . [A]ny representations as to the application of Section 20[]5 [of the FAA] is misplaced. . . ." Apr. 3 Tr., Mahoney Dec., Ex. D, p. 27:15-21.

> b.   <u>*Brad Conway's New York Convention Arguments to the New Jersey Superior Court.*</u>

Once Judge Wigenton had remanded the New Jersey Action back to the New Jersey Superior Court (twice), Brad Conway argued to Judge Moore that the New York Convention applied in his arguments (a) that a Phase Two partial final award should be vacated, and (b) that he should not be sanctioned for having removed the case twice. Specifically, Brad argued that "The—confirmation by the way is not the New Jersey Arbitration Act. . . This involves the Convention Act or at the very least the FAA. . . which are broader than the New Jersey [act] for confirmation and vacat[u]r." May 23 Tr. vol. 1, Mahoney Dec., Ex. E, p. 24:16-22. Again, Brad argued that the New York Convention applied because "the company's operating agreement was global in nature. . . and had members who lived outside the United States." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, pp. 40:25-41:5. Specifically, Brad argued that "the company has foreign owners, and conducts operations in foreign countries. . . [and] the New York Convention applies to an arbitration 'where. . . any contract party is [in] a foreign country.'" May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 56:1-7.

Judge Moore, like Judge Wigenton, rejected these arguments, Judge Moore found that "the New York Convention does not apply." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 67:13-14.

**B. Plaintiffs' arguments of wrongdoing by the Autoclear Defendants and the Lawyer Defendants.**

Plaintiffs argue that the Autoclear and Lawyer Defendants have committed various wrongs that violate the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §§ 1961 *et seq.* ("RICO") and that breached their fiduciary duties to the Company. The crux of Plaintiffs claims is that the Autoclear Defendants reached a settlement in Phase One of the Arbitration with then co-defendant Hazim Audalla. See generally SAC pp. 78-82. Plaintiffs argue this to have been improper because (a) it was not disclosed at the time, (b) it involved "buying" Audalla's proxy, and (c) the Autoclear Defendants paid Audalla personally and then improperly "shifted" that liability to the Company, allegedly harming the Company and defrauding the IRS. See SAC pp. 27, 29 and 38. The other supposed wrongdoings are all allegations relating to the Autoclear and Lawyer Defendants' conduct of the Arbitration. See, e.g., SAC 20 (complaining that Fabrikant "declined to submit any real discovery" in the Arbitration); SAC p. 25 (claiming Roberts "threatened witnesses. . . and has bought off witnesses. . . by threatening in front of key witnesses to "call the police" [and] shouting and storming around deposition room. . ."); SAC p. 26 (claiming Koestel had "tr[ied] to buy plaintiff Josette Caruso's false testimony with a false affidavit she drafted, which Ms. Caruso. . . refused" to sign).

Not only do these acts not violate RICO, see *infra*, they have already been held by Judge Moore not to have been improper *in any way*. In prior arguments in the New Jersey Action, Brad Conway has made extensive arguments about the Autoclear Defendants' settlement with Hazim Audalla, and alleged discovery conduct in the Arbitration that Plaintiffs now claim amount to RICO predicate acts. Brad previously argued that the Autoclear Defendants had:

> defrauded this Court or have hidden discovery from this Court that they bought Mr. Audalla's vote back in 2013. . . . [T]hey have converted that money, well over $1 million, a half of million dollars in cash to the [LLC] from their own personal debt. And they've hidden all the discovery on that. So one of the things I asked. . . in

these motions is for discovery on that of the plaintiff[s]. . . . **And these omissions of conver[sion are] the premise[] of a RICO action** are flagrant—and flagrant and are—and all this, hiding the discovery each and every year. . . . And. . . they transfer those debts to personal debts to the [LLC]. . . . And they do that in the way that allows them to defraud the IRS, the New Jersey equivalent of the IRS on taxes. They took something that's not deductible buying Audalla's vote and they make a deductible backdoor which should be reported to the IRS and the New Jersey Treasury.

May 23 Tr. vol. 1, Mahoney Dec., Ex. E, pp. 26:4-27:11 (emphasis added). Similarly, in a cross-motion Brad Conway filed in response to the Autoclear Defendants' motion to enforce the June 7, 2016 injunction, Brad Conway argued that the Autoclear and Lawyer Defendants had "concealed the settlement agreement that Brad Conway alleges b[]ought defendant Audalla's vote," referring "to Mr. Audalla as a 'psychopathic if not psychotic Sunni Muslim conman.'" May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 27:5-9. He also alleged that "plaintiffs have committed tax evasion by transferring their personal debts to the company." Id., p. 34:8-13. Accordingly, Brad Conway asked the New Jersey court to "sanction plaintiffs for willfully withholding material information from the Court, the parties and the investors," and require "disclosure regarding anything mentioned in the letter and emails" that form the basis of his RICO allegations, "which mention a settlement. . . with Audalla." Id., p. 27:13-18.

As to NMM and the Lawyer Defendants, in defense of the issuance of the TRO, Brad argued that "plaintiffs manipulated the employees, plaintiffs and their counsel manipulated employees into lying in their certifications." Jun. 7 Tr., Mahoney Dec., Ex. C, p. 84:9-21. Brad also previously argued that "Mr. Roberts had a central protective and disguising role in the. . . cover up, whatever that means." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 34:3-5. Brad also previously argued that "the [New Jersey] Court should recuse the Norris McLaughlin firm, because Mr. Roberts and Ms. Koestel will be material witnesses in reviews of the arbitration [and] are part of the conspiracy 'to hurt and convert from' the Company." Id., p. 26:22-27:3. Specifically, Brad

argued that NMM should also be "disqualified, because of its conflicts of interests. They're defendants in the New York [SDNY] action. . . ." Id., p. 33:21-24.

Judge Moore found all of these "conclusions to be vague, unsupported, conclusory and hav[ing] absolutely no connection to what the arbitrator decided." Id., p. 70:3-8. As to the allegations that the Autoclear and Lawyer Defendants "manipulated the employees. . . into lying in their certifications," Judge Moore said he didn't "agree with those arguments. I don't find them to be credible. I don't find the documentary evidence to support any of the arguments." As to the alleged conflict of interest of NMM, Judge Moore found that "there is no conflict, [this is] just an example of Brad Conway trying to get control of the company." Id., p. 35:1-6.

Discussing the settlement at the heart of the SAC, Judge Moore held that:

> [T]here is simply no evidence that the payment to Mr. Audalla was illegal. The document submitted by Brad Conway referenced a 2013 settlement agreement under which the company owed him $500,000 in legal fees. The August 22nd, 2017 letter cited by Brad Conway mentions that the company had not paid the $500,000 yet. Mr. Roberts advised Mr. Audalla's counsel in December of 2016 that the company would not be—it's not in—financial position to pay that sum. **None of that information suggests any illegality, improper behavior of Mr. Roberts [or] his law firm**. Any other allegations made, and I've tried to outline them as best I can, are vague, conclusory, and totally unsubstantiated.

Id., p. 48:9-49:7. As to disqualifying NMM and the Lawyer Defendants from that action (or this one), Judge Moore said:

> Disqualification of the Norris McLaughlin firm, for the reasons I've already stated is denied. . . And there's no evidence that either Mr. Roberts or Ms. Koestel will be witnesses in the New York action. . . this motion to disqualify based upon the simple naming of the firm and the individuals as party defendants does not warrant disqualification.

Id., p. 48:9-49:7.

**ARGUMENT**

**I.**     <u>This Court should abstain from litigating this matter under the *Rooker-Feldman* and *Colorado River* abstention doctrines, given Brad Conway's explicit intent—admitted by Brad himself and already determined by Judge Moore—to use this action to overturn the New Jersey Action and the Arbitration.</u>

Brad Conway already admitted to Judge Moore that this SDNY lawsuit is forum shopping. May 23 Tr. vol. 1, Mahoney Dec., Ex. E, p. 34:8-15 ("This is about getting into the right court, a court that can rule on. . . what happened after February 8[th] [2016]"). Judge Moore already found that this SDNY lawsuit is Brad seeking to relitigate and change the orders entered in the Arbitration and New York Action. May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 41:7-25. Unfortunately for Brad Conway, well-settled federal law requires a Federal Court to abstain from reviewing prior, final decisions of a state court (under the *Rooker-Feldman* doctrine), and to abstain from hearing a case that would entail review of issues concurrently before a state court (under the *Colorado-River* doctrine). These doctrines apply, respectively, to Plaintiffs' claims that were already determined in Phase One and by Judge Moore's orders (*Rooker-Feldman*), and to Plaintiffs' claims that involve the same issues pending in Phase Two (*Colorado-River*). For these reasons alone, this Court should dismiss Plaintiffs claims in their entirety.

**A.**     **The *Rooker-Feldman* doctrine precludes this Court from hearing any of Plaintiffs' claims which would involve review of prior determinations made in Phase One of the Arbitration, as confirmed by the New Jersey Superior Court.**

Most, if not all, of Plaintiffs claims challenge the results of Phase One of the Arbitration, as confirmed in the New Jersey Action. The *Rooker-Feldman* doctrine precludes Federal District Court review of those claims that have already become final in the New Jersey State courts.

The *Rooker-Feldman* doctrine derives from the Supreme Court decisions in <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923), and <u>D.C. Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983). This abstention doctrine stands for "the clear principle that federal district courts lack

24

jurisdiction over suits that are, in substance, appeals from state-court judgments." Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 84 (2d Cir.2005). The doctrine is applied "to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Hoblock, 422 F.3d at 85 (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)). The Second Circuit has outlined four requirements for the application of the *Rooker-Feldman* abstention doctrine:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced—*i.e.*, *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive.

Hoblock, 422 F.3d at 85 (internal quotation marks omitted; alterations in original). If all four requirements are met, a Federal Court should abstain from hearing the matter.

The first and fourth requirements are indisputably satisfied in this case. Brad Conway lost Phase One when, in October 2015, the Arbitrator issued a partial final award finding that Brad lost a vote to the Autoclear Defendants, and, consequently, that Brad Conway was removed from Company management and replaced by the Autoclear Defendants. See Mahoney Dec., Ex. L. Judge Moore confirmed that award on January 28, 2016 and implemented it on February 8, 2016— the day Caruso stole the Company servers (which action resulted in termination of her employment). Id., Ex. M, N, & O. Those orders became final when the Appellate Division dismissed Brad Conway's appeal and denied his motion to vacate the dismissal on September 29, 2017. See May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 40:12-22. Rather than seek certification to the New Jersey Supreme Court—the last legitimate place for Brad to seek review of the judgment

removing him from Company management—Brad Conway, along with Plaintiff Caruso, instead filed this SDNY Action less than a month later on October 25, 2017. See Dkt. No. 2.

> Once the "procedural" requirements of the *Rooker-Feldman* doctrine are met:

>> [T]he application of the. . . doctrine turns on whether the second and third "substantive" requirements are met. And those substantive requirements. . . can be reduced to the following statement: "federal plaintiffs are not subject to the *Rooker-Feldman* bar unless they *complain of an injury* caused by a state judgment."

McKithen v. Brown, 481 F.3d 89, 97 (2d Cir.2007) (quoting Hoblock, 422 F.3d at 87). There is no requirement that the issues presented to the Federal Court be the same as those presented in the State Court action:

>> [T]he applicability of the *Rooker-Feldman* doctrine turns not on the *similarity* between a party's state-court and federal-court claims (which is, generally speaking, the focus of ordinary preclusion law), but rather on the *causal relationship* between the state-court judgment and the injury of which the party complains in federal court.

Id. at 97-98 (emphases in original) (citing Hoblock, 422 F.3d at 87).

> Here, the injuries Plaintiffs complain of in their RICO and breach of fiduciary duties claims are, at base, allegations that Plaintiffs were injured by the Autoclear and Lawyer Defendants' settlement with co-defendant Hazim Audalla and by other conduct in litigating Phase One of the Arbitration. The resulting confirmed Phase One award harmed Plaintiffs, they essentially claim, because when Brad Conway lost, both Plaintiffs also lost their jobs. Put differently, to prevail in this SDNY lawsuit, Plaintiffs would need to successfully challenge the validity of the Arbitration and New Jersey Action orders removing Brad from control, unwind a settlement with co-defendant Hazim Audalla in those actions, place Brad Conway back in control of the Company, and (presumably) give Plaintiff Caruso her job back (because, of course, if Plaintiffs are right she committed no theft of Company property). Brad Conway has repeatedly and expressly stated to Judge Moore that his intention in litigating this action is to determine whether a February 8 vote,

hours after Judge Moore confirmed a 5-year long arbitration about control, put Brad back in power. See ¶ Statement of Facts, § V(B), *supra*. As Judge Moore put it, "[t]hrough the New York action Brad Conway is trying desperately to change the results. . . so that he can regain control of the company. That is patently clear." Since the Arbitration and New Jersey Action judgment produced the "injury" complained of by Plaintiffs—the loss of control of, and employment by, the Company—the *Rooker-Feldman* doctrine applies to bar Plaintiffs' claims insofar as they related to the already-confirmed Phase One award.

**B.** **The *Colorado River* doctrine precludes this Court from hearing any of Plaintiffs' claims which would involve the same or similar issues as those before the parallel, ongoing proceedings in Phase Two of the Arbitration, as compelled by the New Jersey Superior Court.**

What few allegations in the SAC remain that are not barred by *Rooker-Feldman* pertain to ongoing Phase Two of the Arbitration, as ordered by the New Jersey Action, and, therefore, these remaining claims are barred by another abstention doctrine, namely, *Colorado River*. For example, Plaintiffs complain about being "disenfranchised" as members of the Company. See, e.g., SAC p. 33 ("Defendants sought to disenfranchise Josette, an unemployed young grandmother. . . ."); SAC p. 34 ("They particularly targeted Brad and his children and wife, as they were the largest investor[] over three decades, and any disenfranchisement of them would guarantee perpetual control [of the Company]. . . ."). These and the remainder of the allegation contained in the SAC that are not Plaintiffs' attempt at a "redo" of Phase One are, instead, Plaintiffs' attempt to coopt Phase Two of the Arbitration.

Abstention under *Colorado River* applies where, as in the instant case, "state and federal courts exercise concurrent jurisdiction simultaneously." Burnett v. Physician's Online, Inc., 99 F.3d 72, 76 (2d Cir.1996). The Supreme Court held that although a pending action in a state court does not generally bar proceedings involving the same matter in a federal court, a federal court

may dismiss a federal suit for "reasons of wise judicial administration" where there are "exceptional" circumstances. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976); see also Burnett, 99 F.3d at 76. *Colorado River* abstention "rest[s] on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." Colorado River, 424 U.S. at 817.

To determine whether Colorado River abstention is appropriate, the district court must weigh six factors—four from the Colorado River case and two later added by Cone Memorial Hospital. See Burnett, 99 F.3d at 76 (citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16 (1983)). Those factors are:

> (1) the assumption of jurisdiction by either court over any res or property,
> (2) the inconvenience of the federal forum,
> (3) the avoidance of piecemeal litigation, . . . .
> (4) the order in which jurisdiction was obtained. . . .
> (5) whether state or federal law supplies the rule of decision, and
> (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

Id. "The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." Cone Mem'l Hosp., 460 U.S. at 16. However, "[b]y far the most important factor. . . was the 'clear federal policy. . . of avoidance of piecemeal adjudication. . . .'" Id. (quoting Colorado River, 424 U.S. at 819).

For the first factor, there is no dispute over a *res*, which factor is, therefore, neutral.

For the second factor, this Federal forum—in New York—is less convenient than the tribunals in which this dispute has played out since 2011—litigation and arbitration in New Jersey—because almost all of the litigants, including the Company at the center of the dispute, are citizens of New Jersey. Similarly, all the evidence relating to these claims is in New Jersey, as are almost all of the witnesses. This factor, therefore, weighs in favor of abstention.

For the fourth factor, the state court obtained jurisdiction over the dispute seven years ago. "[P]riority should. . . be measured. . . in terms of how much progress has been made in the two actions." Cone Mem'l Hosp., 460 U.S. at 21. In that light, as demonstrated above, the New Jersey court, and the Arbitration it ordered, has made exhaustive progress as compared to this action. Phase One of the Arbitration was completed in 2015 and confirmed in 2016. In Phase Two, discovery is complete, two issues have already been the subject of summary judgment awards— see Mahoney Dec., Ex. J & K. The parties are currently preparing for a final round of dispositive briefing and/or a hearing.

For the fifth factor, state law supplies the rule of decision. The New Jersey courts have already determined that the New Jersey arbitration act applies to disputes governed by the relevant arbitration clause. See § III(A), *infra*. This factor weighs in favor of abstention.

For the sixth factor, the New Jersey courts can as adequately protect Plaintiffs' interests. Brad Conway has called Judge Moore a "parochial old man" who doesn't care about the law and referred to the District of New Jersey as being located in "a river town" with no ability to properly assess complex international issues. These arguments—like all his arguments—are nonsense from the mouth of a sore loser, and nothing more. This factor weighs in favor of abstention.

The third factor, the most important, also weighs in favor of abstention. Some Courts have found that this factor is somewhat blunted in the context of arbitration "because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement." Cone Mem'l Hosp., 460 U.S. at 20. However, Cone Mem'l Hosp. and the cases following it analyzed the *Colorado River* doctrine in terms of competing applications to compel arbitration. Id. (noting that the risk of piecemeal outcomes did not turn on "*which court* decides the question of arbitrability."). Where there has already been extensive progress made in an arbitration "district

29

courts routinely abstain under *Colorado River* where the state courts are already involved in the arbitration." Tessera, Inc. v. Amkor Tech., Inc., No. CV 12-852-SLR, 2014 WL 6997442, at *3 (D. Del. Dec. 10, 2014) (collecting cases).

At least two district courts have assessed a situation similar to this one. In Samuels Grp., Inc., plaintiff had intervened and compelled arbitration in state court, which arbitration then resulted in an award *against* plaintiff. Samuels Grp., Inc. v. Hatch Grading & Contracting, Inc., 697 F. Supp. 2d 1042, 1054 (N.D. Iowa 2010). When the winning party asked the state court that had compelled arbitration to confirm the award, the losing party brought the federal lawsuit seeking vacatur. Id. The Court found that "[t]he threat of conflicting decisions and piecemeal litigation regarding the Award is very real," and applied *Colorado River* abstention. Similarly, in Tessera, the parties' arbitration agreement was covered by California law, which had jurisdiction under the parties' agreement to review the arbitral decision. Tessera, 2014 WL 6997442, at *3. Even though one party had "invoked the jurisdiction of the California courts until it was handed an adverse decision," it "[s]ince then. . . engaged in (charitably speaking) 'reactive' litigation which has engaged the resources of multiple state and federal courts." Id.

The avoidance of piecemeal litigation weighs heavily in favor of abstention. As Judge Moore already found in discussing this action, Plaintiffs are attempting "to re-litigate the Court's order in other forums which. . . in the Court's view threatens the company's ability to function, because of these enormous attorneys fees and other costs." Jul. 13 Tr., Mahoney Dec., Ex. G, p. 26:4-8. The same is true of Plaintiffs attempts to co-opt Phase Two of the Arbitration: the multijurisdictional battle against Brad Conway's (frivolous) lawsuits is an enormous drain on the Company and, needlessly, on this Court's resources. Accordingly, this Court should apply *Colorado River* abstention and dismiss this action in its entirety.

## II.  **Standards applicable to the remainder of this motion.**

Even if this Court does not choose to abstain from hearing this case under the *Rooker-Feldman* and *Colorado River* doctrines, Plaintiffs' complaint must nonetheless be dismissed. This Court must dismiss Plaintiffs' RICO claims for failing to properly plead that cause of action. Once it does, the Court will no longer have jurisdiction over the matter, because the New York Convention does not apply—as already determined by other courts.

A complaint cannot survive a motion to dismiss under Rule 12(b)(6) unless it "contain[s] sufficient factual matter" to state a claim for relief that is "'plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires showing more than "a sheer possibility that a defendant has acted unlawfully." Id. It also requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and more than "'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 557). "[A] formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 1964-65. Rather, the factual allegations must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. To meet this standard, a plaintiff must plead sufficient factual content to allow the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678. Where a plaintiff has alleged fraud, they "must state with particularity the circumstances constituting the fraud" pursuant to the heightened pleading standard of Rule 9. See Fed. R. Civ. P. 9(b). This heightened standard applies to "all allegations of fraudulent predicate acts" under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq* ("RICO"). See First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004)

While the Court must accept as true the Complaint's well-pleaded factual allegations and draw all reasonable inferences in favor of the non-movant, the Court is not required to accept the assertions in the non-moving party's pleading that constitute conclusions of law. Id. While a court normally examines only the allegations of the complaint on a motion to dismiss, it may consider "[d]ocuments that are attached to the complaint or incorporated in it by reference. . . ." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir.2007) (citations omitted). In addition, the court may consider matters of public record, such as court filings. See, e.g., Blue Tree Hotels, Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F .3d 212, 217 (2d Cir.2004); Karamoko v. New York City Hous. Auth., 170 F. Supp. 2d 372, 375 n.1 (S.D.N.Y. 2001).

A court similarly takes "all uncontroverted facts in the complaint. . . as true" in resolving a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(l). Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). However, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" Id. (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000)). And, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." Id. (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir.2003)).

### III.    This Court lacks subject matter jurisdiction over the entirety of the pending dispute.

Plaintiffs cannot establish that this Court has subject matter jurisdiction here. There is neither diversity jurisdiction—as admitted by Brad Conway, see Dkt. No. 50—nor federal question jurisdiction. Plaintiffs are both judicially and collaterally estopped from arguing that the New York Convention applies to their arbitration agreement with the Autoclear Defendants, and Plaintiffs have no arbitration agreement at all with the Lawyer Defendants. Moreover, Plaintiffs

have failed to plead RICO, and, once that claim is dismissed, no other basis for federal jurisdiction (including diversity) exists.

**A.      There is no Federal Question jurisdiction under the New York Convention.**

Plaintiffs allege that this Court has subject matter jurisdiction against both the Autoclear Defendants and the Lawyer Defendants pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("CREFAA" or the "New York Convention"), a treaty implemented by Congress as part of the FAA at 9 U.S.C. §§201 *et seq.*  However, the Convention cannot apply to the claims asserted against the Lawyer Defendants because it is undisputed that there is no agreement to arbitrate (nor any agreement at all) as between Plaintiffs and the Lawyer. Defendants.  Although an agreement to arbitrate does exist between one Plaintiff, Brad Conway, and the Autoclear Defendants, Brad Conway has already asserted, and lost, all of his arguments relating to the New York convention in *two* other Courts, and is precluded from relitigating them here.  Accordingly, there is no subject matter jurisdiction in this Court under the New York Convention.

> *i.      To the extent there is any dispute at all between Plaintiffs and the Lawyer Defendants, that dispute is not subject to the New York Convention.*

Plaintiffs concede that "four factors in combination determine whether a disputed contract 'falls under the convention,' [and i]f *all four* are present, then the dispute is covered. . . ."  See SAC, pp. 6-7 (citation omitted) (emphasis added).  Chief among these requirements is "an agreement in writing to arbitrate the subject of the dispute."  Pan Atlantic Group, Inc. v. Republic Insurance Company, 878 F.Supp. 630, 638 (S.D.N.Y. 1995) (citations omitted).  Plaintiffs do not (and cannot) allege that there is "an agreement in writing to arbitrate" between the Plaintiffs and the Lawyer Defendants.  Therefore, there is no federal question subject matter jurisdiction over the Lawyer Defendants pursuant to the New York Convention.

### ii. *Brad Conway is judicially estopped from arguing that the New York Convention applies to his arbitration agreement with the Autoclear Defendants.*

Brad Conway previously argued to the New Jersey Superior Court that the New Jersey Arbitration Act, and *not* the New York Convention, applied to the arbitration agreement between him and the Autoclear Defendants. See Statement of Facts, § VI(A), *supra*. He argued it in 2011 when he successfully compelled arbitration, and he argued it again in 2015 in arguing for vacatur of the Phase One award removing him from management of the Company. Only when he ran out of options in New Jersey State court did Brad—by his own words—suddenly "realize" that he believed this was a dispute subject to the New York Convention. See Apr. 3 Tr., Mahoney Dec., Ex. D, p. 8:11-14; May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 40:12-22. But Brad Conway is judicially estopped from changing his position now that he wants to forum-shop his way out of a loss in State Court.

"[J]udicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual respresentations and rendered a favorable decision." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 120 (2d Cir. 2005). Here, Brad Conway unequivocally advanced an inconsistent position before the New Jersey Superior Court, where the Company's attorneys—who he still directed—argued that the New Jersey arbitration act applied, and where his personal attorney joined those arguments on Brad's behalf in their entirety. He also obtained a favorable decision—Judge Klein compelled arbitration after applying the New Jersey law that Brad had argued applied. See 2011 Tr., Mahoney Dec., Ex. A, pp. 104-112.

### iii. *Plaintiffs are collaterally estopped from claiming the New York Convention applies.*

Brad Conway also already argued, and lost, the issue of whether the New York Convention applied to his arbitration agreement with the Autoclear Defendants and is collaterally estopped

from relitigating that issue. In fact, Brad Conway already litigated the issue *twice* and lost both times. <u>See</u> Statement of Facts, § VI(A), *supra*.

Federal collateral estoppel principles apply as to the prior determinations of Judge Wigenton in the District of New Jersey. <u>Austin v. Downs, Rachlin & Martin</u>, 114 F. App'x 21, 22 (2d Cir. 2004). Under federal law, collateral estoppel applies when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." <u>Austin v. Downs, Rachlin & Martin</u>, 114 F. App'x 21, 22 (2d Cir. 2004).

Before Judge Wigenton, Brad Conway argued that the New York Convention applied to his dispute with the Autoclear Defendants and moved to consolidate that action with this one. There can be no question the issue of jurisdiction under the New York Convention is identical between that action and this one. The parties fully litigated the issue by presenting cross motions to Judge Wigenton, who actually decided the issue after giving Brad Conway a full and fair opportunity to make arguments in favor of jurisdiction. Then, Judge Wigenton issued a final judgment on the merits—so far as Federal Court jurisdiction was concerned—by remanding the matter to the New Jersey Superior Court, finding that she lacked subject matter jurisdiction. <u>See</u> Mahoney Dec., Ex. T (first remand order).

New Jersey collateral estoppel principles apply as to the prior determinations by Judges Moore and Klein in the New Jersey Action. <u>Hoblock v. Albany Cty. Bd. of Elections</u>, 422 F.3d 77, 93 (2d Cir. 2005) (citing 28 U.S.C. § 1738) ("[F]ederal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state."). Similar to federal law, under New Jersey law, collateral estoppel applies when:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding.
> . . (2) the issue was actually litigated in the prior proceeding. . . (3) the court in the
> prior proceeding issued a final judgment on the merits. . . (4) the determination of
> the issue was essential to the prior judgment. . . and (5) the party against whom the
> doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
> . . .

In re Estate of Dawson, 136 N.J. 1, 20, 641 A.2d 1026 (1994).

Again, Brad Conway presented the identical issue to Judge Moore. He asserted that the New York Convention applied in arguing (a) the law applicable to confirmation of a Phase Two partial final award, and (b) why he should not be sanctioned for removing the case to Federal Court twice. Brad fully briefed and argued the matter before Judge Moore. A determination that New Jersey law, rather than the New York Convention, applied was essential to Judge Moore's decision to (a) confirm the award, and (b) sanction Brad Conway. Judge Moore issued a final judgment on the merits; in fact, he entered judgment against Brad in an amount exceeding $503,000.00. See Mahoney Dec., Ex. S (Sanctions Judgment).

For these reasons, Plaintiffs are estopped from asserting that the New York Convention applies.

**B.      Plaintiffs have not adequately pleaded a Federal RICO claim and, therefore, there is no Federal question subject matter jurisdiction under that statute.**

The last remaining claim under which this Court could retain subject matter jurisdiction is Plaintiffs' RICO allegations. This claim too must be dismissed as inadequately pled—and must be dismissed with prejudice—leaving no basis for Federal Court jurisdiction.

### *i.      Allegations of RICO civil violations are assessed with particularly high scrutiny.*

While civil actions may be maintained under RICO, RICO remains a *criminal* statute targeted at eliminating organized crime. Even in civil actions, it is necessary for the proponent of

a RICO claim to allege that its opponent committed serious criminal acts as enumerated in the RICO statute. Plaintiffs here have not and cannot meet this high requirement.

Because the mere assertion of a civil RICO claim "has an almost inevitable stigmatizing effect on those named as defendants[,]. . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir.1990); Cedar Swamp Holdings, Inc. v. Zaman, 487 F.Supp.2d 444, 449 (S.D.N.Y.2007) (describing civil RICO claims as "the litigation equivalent of a thermonuclear device" to be "flushed out at early stages of litigation.") (quotations and citations omitted). "[RICO] treble damages provisions are not available to remedy every possible injury that can, with some ingenuity, be attributed to a defendant's injurious conduct." Lerner v. Fleet Bank, N.A., 318 F.3d 113, 116 (2d Cir.), cert. denied, 540 U.S. 1012 (2003).

Thus, "courts must attempt to distinguish between claims consistent with Congress's intentions in passing RICO—protecting legitimate businesses from infiltration by organized crime—and traditional state court actions cast in terms of RICO violations simply to gain access to treble damages and attorneys' fees in federal court." Schuh v. Druckman & Sinel, L.L.P., No. 07-cv-366 (LAK)(GWG), 2008 WL 542504, at *8 (S.D.N.Y. Feb. 29, 2008) (internal quotations omitted) (citing United States v. Porcelli, 865 F.2d 1352, 1362 (2d Cir.), cert. denied, 493 U.S. 810 (1989). In other words, "courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.' Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) (quotation and citation omitted).

### ii.     *In the face of the particularly high scrutiny given to RICO allegations, Brad Conway has already admitted that he has not adequately pled a RICO conspiracy and complained that he cannot do so without discovery, completely missing the point of proper pleading*

Brad Conway has already admitted that he has not pled, and cannot plead, a valid RICO claim against any defendant. In a letter to this Court, Brad has already complained that both the Arbitrator and Judge Moore failed to provide him with discovery of certain documents related to his RICO claims—even though the matters before the Arbitrator and Judge Moore are allegedly unrelated to this action in any way. See Dkt. No. 50. In doing so, Brad Conway also suggested that Plaintiffs "cannot be expected to defend a motion to dismiss without them," *i.e.* the documents Brad asked the Arbitrator and Judge Moore to order be produced in discovery.

In other words, Brad believes that the mere utterance of the shibboleth "RICO" permits him to dig through defendants' records to prove his paranoid theory that the entire world conspired to take his job from him (including, apparently, two other judges and an arbitrator). But he completely misses the point of a motion under Fed. R. Civ. P. 12(b)(6). "The issue to be decided on this motion is not whether plaintiff will ultimately prevail in the action, but whether it is entitled to proceed with discovery" in the first place. Speed Auto Sales, Inc. v. Am. Motors Corp., 477 F. Supp. 1193, 1195 (E.D.N.Y. 1979) (citing Green v. Hamilton Intern. Corp., 437 F. Supp. 723 (S.D.N.Y.1977)); see also Ferrer v. Chevron Corp., 484 F.3d 776, 782 (5th Cir. 2007) (rejecting argument that "discovery might permit them to bolster their claims in some manner," because the "inquiry focuses on the allegations in the pleadings, not whether a plaintiff actually has sufficient evidence to succeed on the merits.").

Based solely on Brad's admission that he cannot plead a RICO claim without discovery, the Court should dismiss those claims with prejudice.

### iii. *Pleading requirements for a civil RICO claim.*

RICO § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

Therefore, to state a claim under RICO § 1962(c), the Plaintiffs must allege that Defendants (1) "conducted or participated" (2) in the affairs of an "enterprise" (3) through a "pattern" (4) of "racketeering activity" and (5) that such actions caused injury to the Plaintiffs. <u>Moss v. Morgan Stanley, Inc.</u>, 719 F.2d 5, 17 (2d Cir. 1983). Plaintiffs have not and cannot meet this burden.

### iv. *Plaintiff's RICO allegations.*

If you cut through the mostly unintelligible and non-RICO related assertions in the SAC, Plaintiffs have essentially alleged that the Lawyer Defendants, the Autoclear Defendants and defendant Audalla have joined together for the purpose of illegally entering into a settlement of claims by the Company against Defendant Audalla. The settlement included, Plaintiffs allege, an agreement by Audalla to provide his proxy in connection with a Company member vote, and for the Company to allegedly pay a debt allegedly owed by the Autoclear Defendants individually to Defendant Audalla in exchange for this vote. The Company also settled various claims against Audalla referenced throughout the SAC (*i.e.* allegations that he stole Company product, etc.). Plaintiffs have, at best, alleged a breach of fiduciary duty claim against the Autoclear Defendants that the Lawyer Defendants allegedly facilitated (and haven't even pleaded that, <u>see</u> § V, *infra*). The claims simply do not rise to the level constituting RICO.

### v. *The Plaintiffs Have Not Properly Pled An "Enterprise."*

Plaintiffs fail to clearly define what they allege to be the "enterprise." To the best of our ability to comprehend Plaintiffs' allegations, on page 36 of the SAC, Plaintiffs appear to allege the

"Enterprise" to be "the Enterprise, comprising Audalla, the Action Group, the Norris defendants and Bracewell." SAC, p.36. These allegations are not a RICO "enterprise."

The term "enterprise" is defined in 18 U.S.C. § 1961(4) to mean "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The enterprise must be "separate and apart from the pattern of activity in which it engages," and, for an association-in-fact enterprise (as alleged here), it must be a "group of individuals associated together for a common purpose of engaging in a course of conduct" with "an ongoing organization" and with "the various associates function[ing] as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). For an association-in-fact enterprise, a court "must look to the hierarchy, organization, and activities of the association." Schmidt v. Fleet Bank, 16 F.Supp.2d 340, 349 (SDNY 1998) (quotations and citations omitted). Plaintiffs must also allege facts specifying "how these members joined together as a group to achieve these purposes." Moll v. U.S.Life Title Ins.Co., 654 F. Supp. 1012, 1031 (SDNY 1987). The RICO enterprise "must exhibit structural continuity which exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an *ad hoc* basis." Pavlov v. Bank of New York, 135 F.Supp.2d 426, 430 (SDNY 2001).

Plaintiffs have not properly pleaded an ongoing enterprise. A general assertion that a group of defendants constituted an "enterprise" is not enough. Plaintiffs' allegations that the Autoclear Defendants reached a settlement with Audalla—and agreed to have the Company pay that settlement—do not plead an enterprise within the purview of RICO, because the alleged "enterprise" lacks continuity. Two (or more) individuals who join together for the commission of one discrete criminal offense have not created an "association-in-fact" enterprise, even if they

commit two predicate acts during the commission of this offense, because their relationship to one another has no continuity. Plaintiffs have also failed to plead any hierarchy and organization of the alleged "enterprise," and have not explained its structural continuity, organizational pattern, or system of authority, all as required. Plaintiffs allege only that the Defendants came together in this one instance—reaching a settlement whereby the Autoclear Defendants allegedly paid Audalla for a proxy, settled claims against him, and promised to later have the Company pay Audalla. Accordingly, Plaintiffs' allegations do not establish an enterprise, a continuing unit, and the Second Amended Complaint should be dismissed under Rule 12(b)(6).

### vi. *Plaintiffs do not adequately allege that the Autoclear or Lawyer Defendants "conducted or participated" in the affairs of an enterprise.*

To have "conducted or participated" in an enterprise, a defendant must have "some part in directing those affairs," *i.e.* they must have "participated in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 179, 183 (1993). "[T]he test is not involvement but control.' Department of Econ. Dev. v. Arthur Andersen & Co., 924 F. Supp. 449, 466 (S.D.N.Y. 1996) (quotations omitted). A defendant cannot merely have provided services to an enterprise; those services must have allowed the defendant to direct the affairs of the enterprise. Matter of Lake States Commodities, Inc., 936 F. Supp. 1461, 1477 (N.D. Ill. 1996). Here, the SAC does not explain how *any* defendant "conducted or participated" in an enterprise, and the RICO claims must accordingly be dismissed.

### vii. *Plaintiffs have not properly pled a conspiracy.*

Throughout the SAC, Plaintiffs throw the word "conspiracy" without ever explaining that allegation. To state a RICO conspiracy, a plaintiff must plead *as to each alleged co-conspirator*: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy, and (3) that the co-conspirator knowingly participated the conspiracy. Hecht v.

Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990). Plaintiffs must allege more than a defendant's acquiescence to the RICO predicate acts of others; they must allege that each defendant agreed to personally commit at least two predicate acts. Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1344-45 (2d Cir. 1994); Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F.Supp.2d 282, (S.D.N.Y. 2000).

Here, Plaintiffs do not specifically refer to each of the Autoclear or Lawyer Defendants' agreement *at all*, instead simply saying that all these persons "conspired." Plaintiffs certainly do not allege that *each* of the Autoclear and Lawyer Defendants individually agreed to commit two predicate acts. Accordingly, Plaintiffs RICO conspiracy claims must be dismissed.

### viii. *Plaintiffs have not pled that the Autoclear or Lawyer Defendants committed any predicate acts.*

In order to sustain their RICO claim, the Plaintiffs must allege that defendants committed one of the crimes specifically listed in 18 U.S.C. § 1961(1). Revak v. SEC Realty Corp., 18 F.3d 81, 89 (2d Cir. 1994). Plaintiffs have not even cited any of those statutes, instead indiscriminately throwing around words like "conversion," "tax evasion," and the like. But this is not sufficient to plead a RICO claim.

Plaintiffs are collaterally estopped from arguing that any of the alleged conduct is improper *at all*, much less that it constituted a violation of one of the criminal statutes that constitute RICO predicate acts. Judge Moore already found that "there is simply no evidence that the payment to Mr. Audalla was illegal," and, addressing the emails and letters attached to Plaintiffs SAC, found that "[n]one of that information suggests any illegality, improper behavior. . . ." May 23 Tr. vol. 2, Mahoney Dec., Ex. F, p. 48:9-49:7. Because these identical issues have already been raised in prior litigation, lost by Brad Conway, and resulted in a final judgment (*i.e.* confirmation of a Phase

Two partial final award and sanctioning of Brad Conway), Plaintiffs are collaterally estopped from relitigating these claims. In re Estate of Dawson, 136 N.J. 1, 20 (1994).

Even if Plaintiffs were not estopped from making these arguments, they do not amount to RICO predicate acts. For example, tax evasion is not even one of the listed crimes constituting a predicate act. See 18 U.S.C. 1961(1). Nor are common law fraud, breach of fiduciary duty, or conversion. Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments, Ltd., 154 F.Supp.2d 682, 690 (S.D.N.Y. 2001). For this reason, Plaintiffs' RICO claims must be dismissed.

> **ix.** ***Plaintiffs have not pled that the Autoclear or Lawyer Defendants committed a "pattern" of racketeering activity.***

Plaintiffs must allege a "pattern" of racketeering activity. A "pattern of racketeering activity does not mean a pattern of fraudulent behavior that facilitates a single fraudulent loss; rather a pattern of racketeering activity means. . . a pattern of fraudulent losses." Cherry v. Hall, No. 02-cv-7895, 2003 WL 29931 (N.D. Ill., Jan. 3, 2003). Here, Plaintiffs do not allege a pattern of losses from various RICO activity. They allege a series of acts (settlement and other litigation conduct) all leading to one loss, *i.e.* Brad Conway's loss of control and Joan Caruso's loss of her job, when the Autoclear Defendants won Phase One and obtained control of the Company. That is insufficient. See, e.g., Pagel v. Washington Mut. Bank, Inc., 153 Fed. App'x 498 (10th Cir., 2005) (affirming dismissal of a mortgagor's RICO claim where plaintiff failed to establish a pattern where it alleged only "a single scheme to accomplish one discrete goal").

> **x.** ***Plaintiffs have not pled that they have suffered a loss "by reason of" the Autoclear or Lawyer Defendants' alleged racketeering activity.***

Section 1964(c) limits standing to sue to persons "injured in [their] business or property by reason of a violation of section 1962. . . ." A plaintiff must allege an injury caused by the defendant's "pattern of racketeering activity or by [the] individual RICO predicate acts." Hecht v.

Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990); see also Holmes v. Securities Investor Prot. Corp., 503 U.S. 258, 267-68 (1992) (stating a plaintiff must show "that the defendant's violation was a 'but for' cause of his injury," and that it "was the proximate cause as well."). Here, Plaintiffs cannot allege that the pattern caused a loss; Brad Conway lost control of the company in Phase One without the Arbitrator accounting for the allegedly "bought" Hazim Audalla proxy. See Mahoney Dec., Ex. L, Award p. 3, Opinion p. 17. Joan Caruso lost her job because she stole Company property. In Phase Two, both may lose membership interests (the alleged "disenfranchisement") because a duly appointed arbitrator will determine whether Brad Conway could issue those interests in the first place, and not as a result of any wrongdoing. Accordingly, the alleged RICO conduct is neither the but for nor proximate cause of the complained-of injuries, and the RICO count must be dismissed.

>    *xi.  Dismissal of Plaintiffs' RICO claims should be with prejudice.*

Although Fed. R. Civ. P. 15(a) provides that the court should grant leave to amend when justice requires, leave should not be granted where, as here, there is no merit to the amendments or amendment would be futile. See Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990). Here, because Plaintiffs claims against the Autoclear and Lawyer Defendants are baseless, and Plaintiffs cannot possibly amend to cure the multitude of defects in their RICO claim, these claims should be dismissed with prejudice.

## IV.  Every alleged action taken by the Lawyer Defendants is subject to the litigation privilege.

Every action allegedly taken by the Lawyer Defendants was taken in furtherance of litigation or arbitration. It is therefore subject to the litigation privilege, which bars any claims against them for that conduct.

In this case, then, New Jersey law applies[12]. New Jersey recognizes an "absolute litigation privilege," Roggio v. McElroy, Deutch, Mulvaney, & Carpenter, 415 F.App'x. 432, 433 (3d Cir. 2011), which is "well-established and broadly applicable." Richenbach v. Wells Fargo Bank, N.A., 635 F.Supp.2d 389, 401 (D.N.J. 2009) (internal citation omitted). The privilege "shields any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." Loigman v. Twp. Comm. of Twp. of Middletown, 185 N.J. 566, 585, 889 A.2d 426 (2006) (internal citation and quotation marks omitted). "Far from being an exception, the litigation privilege is applicable as a general rule." Richenbach, 635 F. Supp.2d at 402.

The privilege immunizes parties from practically all possible causes of action arising out of litigation conduct. See Baglini v. Lauletta, 338 N.J. Super. 282, 297, 768 A.2d 825 (App. Div. 2001); see also Loigman, 185 N.J. at 583 ("[T]he spectrum of legal theories to which the privilege has been applied includes . . . civil conspiracy. . . [and] fraud."). New Jersey litigation privilege has been applied even to RICO allegations. Winters v. Jones, No. CV 16-9020, 2018 WL 326518, at *8 (D.N.J. Jan. 8, 2018); accord Bletas v. Deluca, No. 11 CIV. 1777 (NRB), 2011 WL 13130879, at *9 (S.D.N.Y. Nov. 15, 2011) (applying New York and Connecticut's equally broad litigation

---

[12] A choice of law analysis for litigation privilege dictates that the applicable law is that of the place where the conduct occurred—*i.e.* the state law where the litigation in which the conduct took place was pending. AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270-71 (2d Cir. 1992). Here, all of the alleged conduct took place in New Jersey. To the extent Plaintiffs might argue New York law applies, it is similarly broad and would also protect against even RICO claims. See, e.g., Gavrilov v. Slinim, No. 26396/03 2004 WL 2785181, at *5 (Sup. Ct., Dec. 1, 2004) (granting summary judgment holding that statements made in litigation are absolutely privileged and cannot form the basis for a RICO action), aff'd, 34 A.D.3d 730, 823 N.Y.S.2d 911 (2d Dep't 2006); Singh v. HSBC Bank USA, 200 F. Supp. 2d 338, 339–40 (S.D.N.Y. 2002)("Even if plaintiffs were able to plead a RICO cause of action. . . [the alleged conduct] would be entitled to absolute immunity as a matter of law.").

privilege to allegations of "enterprise corruption"). In fact, here, as in Bletas, there would be "some irony in the fact that plaintiffs have endeavored to invade the privilege given to attorneys and litigants. . . while at the same time making baseless criminal accusations which. . . would be defamation *per se* if not for this very privilege." 2011 WL 13130879, at *9, FN 7.

As to the scope of the conduct protected by the privilege, "[t]he only limitation New Jersey places upon the privilege is that the statements at issue have some relation to the nature of the proceedings." Rabinowitz v. Wahrenberger, 406 N.J. Super. 126, 134, 966 A.2d 1091 (App. Div. 2009). Relevancy for purposes of the litigation privilege is "interpreted quite broadly and liberally." DeVivo v. Ascher, 228 N.J. Super. 453, 461, 550 A.2d 163 (App. Div. 1988), certif. denied, 114 N.J. 482, 555 A.2d 607 (1989). The privilege applies to almost any conduct by a lawyer performed in connection with a litigation:

> Lawyers necessarily exercise a wide degree of discretion in performing their duties in the course of judicial proceedings, and must be free to pursue the best course charted for their clients without the distraction of a vindictive lawsuit looming on the horizon. The litigation privilege must have sufficient breadth to advance the best interests of the administration of justice. For that reason, courts have extended the reach of the litigation privilege even to statements made by attorneys outside the courtroom, **such as in attorney interviews and settlement negotiations.**[13]

Loigman v. Twp. Comm. of Twp. of Middletown, 185 N.J. 566, 587–88, 889 A.2d 426 (2006);

see also Ruberton, 280 N.J.Super. 125, 132-34 654 A.2d 1002 (App. Div. 1995) (finding that the privilege covers settlement negotiations); Rabinowitz v. Wahrenberger, 406 N.J. Super. 126, 135, 966 A.2d 1091 (App. Div. 2009) (finding the privilege applied to conduct at a deposition); Thomas

---

[13] The law is the same in New York. Officemax Inc. v. Cinotti, 966 F. Supp. 2d 74, 79 (E.D.N.Y. 2013) ("The litigation privilege is absolute and 'has been applied not only to statements made in pleadings and in court, but also to statements made. . . during offers of settlement by attorneys.'" (quoting Aequitron Med., Inc. v. Dyro, 999 F.Supp. 294, 298 (E.D.N.Y.1998)).

v. Ford Motor Co., 137 F. Supp. 2d 575, 585 (D.N.J. 2001) (noting the privilege extends to "preliminary conversations and interviews between a prospective witness and an attorney. . . .").

Plaintiffs' entire claim is based on actions involved in the Arbitration and New Jersey State Action. Plaintiffs assert that the Lawyer Defendants assisted the Autoclear Defendants in reaching a settlement with defendant Audalla in the arbitration which somehow, they allege, wrongfully damaged the Company. They also contend that the Lawyer Defendants drafted a "false affidavit" during the arbitration, and that the Lawyer Defendants shouted in the presence of witnesses during depositions. All of this conduct has already been found by Judge Moore not to be improper in any way. Jun. 7 Tr., Mahoney Dec., Ex. C, p. 84:9-21. Equally important is that all of the conduct, wrongful or not—and it is not—is protected by the litigation privilege and, therefore, not actionable by plaintiffs in any way.

## V.    Any remaining allegations are simple fiduciary breach claims, which (a) are improperly pled, and (b) subject to a valid and binding arbitration clause.

Even if this Court had subject matter jurisdiction (which it does not), and even if the above-argued abstention doctrines did not apply (which they do), the only remaining claims after dismissal of the RICO claims and all the claims against the Lawyer Defendants would be basic fiduciary breach claims against the Autoclear Defendants. Even these fiduciary breach claims are not properly before this Court, and must be either dismissed or compelled to arbitration.

### A.    Plaintiffs fail to properly plead derivative fiduciary breach claims.

A derivative action permits an individual shareholder or member[14] of a company to bring a lawsuit to vindicate a company's cause of action against officers, directors, or managers. Kalin v. Xanboo, Inc., 526 F. Supp. 2d 392, 409 (S.D.N.Y. 2007). Plaintiffs' fiduciary breach claims

---

[14] Although the law cited here applies to corporations, it also applies to LLC's. Stack v. Midwood Chayim Aruchim Dialysis Assocs., Inc., 54 A.D.3d 935 (2d Dept. 2008) ("members of an LLC may bring derivative suits on behalf of the LLC").

are derivative only.  See, e.g. SAC p. 89, ¶ 57 (citing only damage to the LLC and, derivatively, "plaintiffs owners" of the LLC in Plaintiffs' fiduciary breach count).  Yet Plaintiffs have not even *tried* to meet the requirements of pleading derivative claims.

"To prevent abuse of this kind of action. . . courts have imposed a requirement that the shareholder establish that 'the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'"  Id. (noting one well-known exception, that demand on the company would be futile).  Along these lines, the Federal Rules obligate a plaintiff to "state with particularity (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority. . . and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).  The federal rules also state that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of. . . members who are similarly situated. . . ."  Id. at 23.1(a).

Here, Plaintiffs have not pled a demand on the corporation, nor particularized facts as to why that demand should be excused.  Plaintiffs are also ***not*** fairly and adequately representative of the interests of similarly situated members, given that they both lost their jobs with the Company because of serious, potentially criminal misconduct.  For both reasons, the remaining fiduciary breach claims should be dismissed with prejudice.

**B.     Plaintiffs' fiduciary breach claims are subject to compulsory arbitration.**

Even if the fiduciary breach claims were properly pled, this Court would not be the proper forum to hear them, given the arbitration clause in the parties' operating agreement.  Brad Conway is enjoined (and collaterally estopped) from arguing that any operating agreement applies to disputes between members of the Company other than the 1995 operating agreement. See Mahoney Dec., Ex. Q, ¶ 3(i).  Brad Conway previously argued that the arbitration clause in that very operating agreement was broad enough to cover claims for member expulsion and breaches

of fiduciary duties.  See Mahoney Dec., Ex. I, p. 7; 2011 Tr., Mahoney Dec., Ex. C, p. 3:9-10; 57:22-58:2.  Judge Klein accepted these arguments and compelled arbitration.  See 2011 Tr., Mahoney Dec., Ex. A, p. 106:12-17; 112:5-9.  Brad Conway is, therefore, collaterally estopped from arguing that the arbitration clause does not cover any fiduciary breach claims, including those he now purports to bring against the Autoclear Defendants.  See generally, In re Estate of Dawson, 136 N.J. 1, 20 (1994).  The issue of arbitrability was already decided in the New Jersey action, after having been actually litigated.  The Court ordered arbitration and later entered a final judgment on the merits when it confirmed Phase I.  The arbitrability of fiduciary breach claims were essential to this prior judgment, and Brad Conway was a party to that prior litigation. Therefore, all of the requirements for collateral estoppel are met.  Id.

For these reasons, even if the court finds it has jurisdiction, and fails to abstain from hearing this case, and determines not to dismiss the fiduciary breach claims, the Court must dismiss the action in favor of arbitration.

**CONCLUSION**

Defendants Charles Fabrikant, Chris Regan, David Bondy, Todd Conway, David Roberts, Deanna Koestel, and Autoclear, LLC respectfully request that the Court grant their motion to dismiss Plaintiffs Second Amended Complaint in its entirety, and award all other relief the Court deems just and proper.

Dated: New York, New York
August 6, 2018

**NORRIS, McLAUGHLIN & MARCUS, P.A.**

By:    /s/ Nicholas A. Duston
      Robert Mahoney, Esq. (*pro hac vice*)
      Nicholas A. Duston, Esq.
      875 Third Avenue, 8th Floor
      New York, New York 10022
      (212) 808-0700
      rmahoney@nmmlaw.com
      *Attorneys for Defendants Defendants Charles Fabrikant, Fred Farkouh, Chris Regan, David Bondy, Todd Conway, David Roberts, Deanna Koestel, and Autoclear, LLC*